UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW YORK STATE TEAMSTERS CONFERENCE PENSION AND RETIREMENT FUND, by its Trustees, Michael S. Scalzo, Sr., John Bulgaro, Daniel W. Schmidt, Tom J. Ventura, Bob Schaeffer, Brian Hammond, Mark May and Paul Markwitz,<br><br>           Plaintiffs,<br><br>    v.<br><br>C&S WHOLESALE GROCERS, INC.,<br><br>           Defendant. | Case No.:  5:16-cv-084 (FJS/ATB)<br><br>**FIRST AMENDED COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs, New York State Teamsters Conference Pension and Retirement Fund ("Pension Fund") and its Board of Trustees ("Trustees"), by and through their counsel, bring this First Amended Complaint against Defendant, C&S Wholesale Grocers, Inc. ("C&S").

## SUMMARY OF ACTION

This action arises out of C&S's December 2008 takeover of the Penn Traffic Company's wholesale distribution business.  Following the takeover, the Penn Traffic Company went bankrupt, hundreds of Teamsters union members once employed by the Penn Traffic Company lost their jobs, and more than $58 million in withdrawal liability owed to the Pension Fund went unpaid.  In short, all went according to C&S's plan—and the Pension Fund, its thousands of participants, and the families of those participants were left to suffer the consequences.

C&S is liable for the unpaid withdrawal liability for four independent reasons.  First, it was the successor to the Penn Traffic's Company's wholesale distribution business, and as a

1

matter of law it assumed the Penn Traffic Company's withdrawal liability.  Second, C&S purposefully structured its takeover of the Penn Traffic Company's wholesale distribution business to evade or avoid pension and withdrawal liability to the Pension Fund, an act which, in and of itself, is a violation of federal law that subjects C&S to withdrawal liability.  Third, notwithstanding the technical separation in ownership between C&S and the Penn Traffic Company under state law, C&S and the Penn Traffic Company operated in sufficient tandem such that they were in "common control" with one another under federal law, rendering C&S jointly and severally liable for the Penn Traffic Company's withdrawal liability.  And fourth, following the takeover, C&S was, for all intents and purposes, an employer of the Teamsters union members, and as such it now shares in the withdrawal liability owed to the Pension Fund.

 In support of these claims, Plaintiffs make the following more detailed allegations based upon personal knowledge as to their own actions, and upon information and belief as to the actions of others.

## JURISDICTION AND VENUE

1) This is an action for monetary and/or equitable relief to recover employer withdrawal liability, interest, costs, attorneys' fees and other penalties as authorized by the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

2) Pursuant to ERISA sections 4221(b)(1), 4301(a)(1) and/or 4301(b) the Trustees are authorized to bring a civil action on behalf of the Pension Fund for the purpose of collecting unpaid withdrawal liability, among other things.

3) This Court has subject matter jurisdiction pursuant to ERISA section 4301(c).

4) Venue properly lies in this Court pursuant to ERISA section 4301(d) because the Pension Fund is administered within this district.

5) Venue also lies in this Court pursuant to the rules and regulations of the Pension Fund, which designate that such actions be brought here.

6) Plaintiffs have served a copy of this First Amended Complaint upon the Pension Benefit Guaranty Corporation by certified mail, pursuant to ERISA section 4301(g).

## PARTIES

7) The Pension Fund, as an employee benefit fund, was created and exists pursuant to an Agreement and Declaration of Trust entered into between participating employers and union locals affiliated with the International Brotherhood of Teamsters ("Teamsters"). The Pension Fund is a "multiemployer plan" as defined in ERISA section 3(37)(A).

8) At all times relevant hereto, the Pension Fund has had its offices at, and has been administered from, 151 Northern Concourse, Syracuse, New York 13212.

9) The Pension Fund is managed by its Board of Trustees, which is the "plan sponsor" as defined in ERISA section 3(16)(B)(iii). The Pension Fund, by its Board of Trustees, as plan sponsor of an employee benefit and multiemployer pension plan ("Plan"), is established and regulated pursuant to ERISA and the Labor Management Relations Act.

10) The Board of Trustees is comprised of an equal number of labor and management representatives.  All are "fiduciaries" of the Plan as defined in ERISA section 3(21).  Michael S. Scalzo, John Bulgaro, Daniel W. Schmidt, Tom J. Ventura, Bob Schaeffer,  Brian Hammond, Mark May and Paul Markwitz are the individual trustees of the Pension Fund.

11) The Pension Fund receives contributions from employers which operate or do business within the jurisdiction of Teamsters locals and which participate in the Plan pursuant to collective bargaining agreements and participation agreements.

12) The Pension Fund pays pension and retirement benefits to qualified participants in the Plan. The Pension Fund provides pension and retirement benefits to more than 35,000 active and retired Teamsters members and their families throughout New York State.

13) C&S is one of the largest, privately-held companies in the United States with sales exceeding $25 billion. C&S bills itself as the largest food wholesale supply company in the country.

14) C&S is a Vermont corporation with its principal place of business located at 7 Corporate Dr., Keene, New Hampshire 03431. C&S may not be in good standing under the laws of the State of Vermont for failure to hold regular board of directors meetings or other failures to comply with corporate formalities.

## BACKGROUND

### The Penn Traffic Company and its Syracuse Facilities

15) The Penn Traffic Company ("Penn Traffic") was a well-known, Syracuse-based company. It was founded in 1854. As recently as 2008, it was one of the leading food retailers and wholesalers in the northeastern United States.

16) Through its retail division, Penn Traffic owned and operated approximately 109 supermarkets located in New York, Pennsylvania, Vermont and New Hampshire under the "P&C Foods," "Bi-Lo Foods," and "Quality Markets" trade names, among others. Through its wholesale distribution division, Penn Traffic supplied food and other supermarket products to 121 independently-owned supermarkets.

17) Penn Traffic owned and operated warehouses located in both Syracuse, New York and Dubois, Pennsylvania where product was shipped to stores for both the retail and the wholesale distribution divisions.

18) Penn Traffic's wholesale distribution division utilized, in part, several Syracuse-based warehouse facilities.

19) Penn Traffic employed approximately 450 members of Teamsters Local 317 who performed bargaining unit work at the Syracuse facilities. That work included, among other jobs, warehouse, maintenance, drivers, and mechanics.

20) Penn Traffic was a party to various collective bargaining agreements with Teamsters Local 317. Among other things, the collective bargaining agreements required contributions to the Pension Fund on behalf of the employees represented by Teamsters Local 317 who performed bargaining unit work at the Syracuse facilities.

21) Penn Traffic was also a party to various participation agreements with the Pension Fund that further required contributions to the Pension Fund on behalf of the Penn Traffic employees represented by Teamsters Local 317 who performed bargaining unit work at the Syracuse facilities.

22) Penn Traffic was one of the largest contributing employers to the Pension Fund, contributing approximately $1.8 million annually to the Pension Fund for the work performed by the Penn Traffic employees represented by Teamsters Local 317 at the Syracuse facilities.

23) In or around May 2003, Penn Traffic filed for Chapter 11 bankruptcy protection. In or around April 2005, Penn Traffic emerged from Chapter 11 bankruptcy. At that time, Penn Traffic's then-CEO, Robert Chapman, declared that Penn Traffic would "emerge from Chapter 11 with a solid financial platform, a core of healthy and competitive supermarkets, and strong bakery and wholesale/franchise operations." He further declared that Penn Traffic was "beginning life as a new company with a solid capital structure, greatly reduced debt, disciplined and improved operations, and a strengthened management team. Penn Traffic today is a leaner,

strong competitor with bright prospects. We are excited to now redirect our attention from the turnaround toward growth and profitability."

24) In 2006, Mr. Gregory Young joined Penn Traffic as its Executive Vice President and Chief Operating Officer. Immediately prior to joining Penn Traffic, Mr. Young was employed by C&S, where he held the title of Vice President/General Manager, Retail and Independent Sales.

25) Also in 2006, Myles da Cunha joined Penn Traffic as its Vice President of Merchandising. Immediately prior to joining Penn Traffic, Mr. da Cunha was employed by C&S, where he held the title of Senior Director of Merchandising.

26) Several other executives of C&S also joined Penn Traffic at or around the same time as Mr. Young.

27) The former Co-President of C&S, Mark Gross, left C&S to form Surry Investment Advisors, LLC ("Surry"), which was retained by Penn Traffic to act as its financial advisor, as set forth below.

28) In October 2007, Mr. Young was promoted to President and CEO of Penn Traffic. Also in 2007, despite less than a year of formal employment at Penn Traffic, other former C&S executives received significant promotions at Penn Traffic.

## The 2008 Transaction with C&S

29) In or around March 2008, C&S began discussing a joint takeover of Penn Traffic with Tops Markets. It was initially proposed that Tops Markets would take over Penn Traffic's retail stores, and C&S would take over Penn Traffic's wholesale distribution division.

30) Penn Traffic's Syracuse-based Teamsters Local 317 employees participated in the Pension Fund, which was associated with a significant withdrawal liability obligation.

31) In contrast, Penn Traffic's DuBois warehouse employees participated in a Penn Traffic single-employer pension plan, which was not subject to any withdrawal liability.

32) During 2008, Penn Traffic requested, and the Pension Fund's external actuary calculated, down to the penny, Penn Traffic's present estimated withdrawal liability obligation to the Pension Fund. The Pension Fund provided Penn Traffic with both this estimated withdrawal liability and the details underlying the calculation, information which Penn Traffic promptly passed to C&S.

33) C&S, which was itself a direct contributing employer to the Pension Fund through warehouses it managed for Tops Markets in Lancaster and Cheektowaga, NY, was already familiar with the Pension Fund's underfunding and actuarial assumptions, and had been continuously monitoring the steady increases in its own potential estimated withdrawal liability to the Pension Fund.

34) In addition to relying on the calculations provided by the Pension Fund, C&S commissioned projections on future withdrawal liability increases to the Pension Fund.

35) During discussions of how to structure a transaction, the most significant concern expressed by both Tops Markets and C&S was Penn Traffic's pension liability exposure.

36) C&S indicated that it was interested in formally taking over Penn Traffic's entire wholesale distribution division *if* Tops Markets and/or Penn Traffic could provide C&S sufficient protection from withdrawal liability exposure related to the Syracuse warehouses.

37) In June 2008, C&S proposed to formally take over Penn Traffic's entire wholesale distribution business.

38) At the time, Surry was working with Penn Traffic to divest and/or dissolve its business operations.

39) Because C&S did not want to comply with ERISA section 4204 (which, under certain circumstances, permits pension liabilities to be transferred between companies without triggering a withdrawal), C&S's proposal would have triggered Penn Traffic's withdrawal liability. Accordingly, C&S advised that Penn Traffic would need to satisfy the full amount of the withdrawal liability obligation to the Pension Fund.

40) In the event that Penn Traffic was unwilling to trigger and pay its withdrawal liability, C&S proposed an alternative, staged approach that would involve C&S immediately taking over procurement and formally assuming control of the DuBois warehouses, but leave formally assuming control of the Syracuse warehouses until a later date. In the interim, C&S would work with Penn Traffic to implement C&S's state-of-the-art warehouse operations systems and procedures to improve efficiency at the Syracuse warehouses, even though Penn Traffic would remain the employer of record for the Teamsters employees.

41) The reason C&S did *not* want to immediately proceed with formally taking control of the Syracuse warehouses, but did want to immediately proceed with formally taking control of the DuBois warehouses, was because of the difference in withdrawal liability.

42) C&S was aware that, if it had formally acquired the entirety of Penn Traffic's wholesale distribution division and become the employer of record of all of the Local 317 members, it would be liable to the Pension Fund for withdrawal liability, as the successor to Penn Traffic's warehouse distribution business.

43) But for the withdrawal liability associated with the Local 317 members who worked at Penn Traffic's Syracuse warehouses, in 2008 C&S would have formally acquired the entirety of Penn Traffic's wholesale distribution division and become the employer of record of all of the Local 317 members.

44) Penn Traffic's owners and executives did not want to trigger withdrawal liability at the time of a sale to C&S, and instead preferred to use Penn Traffic's available assets to enrich themselves.

45) To lessen the likelihood that C&S would be deemed liable for the withdrawal liability, C&S and Penn Traffic agreed to have C&S succeed to Penn Traffic's wholesale distribution business in two steps.

46) First, C&S would acquire substantially all of the assets (including all of the customers) of Penn Traffic's wholesale distribution business. But Penn Traffic would continue to nominally hold the withdrawal liability by remaining the employer of record for the Local 317 members at the Syracuse warehouses.

47) Second, Penn Traffic would fire all of the Local 317 members at the Syracuse warehouses, thereby triggering the withdrawal liability. That withdrawal liability would be discharged in bankruptcy, and C&S would continue to provide identical services and products to a virtually indistinguishable set of stores and customers.

48) In fact, as early as 2006, Penn Traffic executives had considered, in connection with closing a warehouse in Jamestown, NY in favor of using a C&S warehouse, the possibility of nonetheless temporarily retaining the to-be-fired employees in order to support an argument that no withdrawal liability was owed.

49) C&S was aware that if it had continued to operate out of the Syracuse warehouses it faced a substantial risk of successor liability. In order to lessen that risk, C&S planned to run an otherwise identical business out of a different warehouse.

50) Prior to acquiring substantially all of the assets of Penn Traffic's wholesale distribution business, C&S began looking for functionally identical locations proximate to the

9

existing Syracuse warehouses from which to operate a substitute warehouse. No business reason existed for such a change.

## The Transaction

51)   In December 2008, Penn Traffic and C&S executed an asset purchase agreement and other related agreements that effected C&S's takeover of the wholesale distribution division operated by Penn Traffic (hereinafter referred to as the "Transaction").

52)   Through the asset purchase agreement, C&S acquired, *inter alia*, Penn Traffic's wholesale distribution contracts, customers, equipment, files, records, goodwill, intellectual property, accounts receivable, and employees dedicated to Penn Traffic's wholesale distribution division who were <u>not</u> members of Teamsters Local 317.

53)   As a condition of the asset purchase agreement, C&S and Penn Traffic then executed a series of additional agreements which, combined with the asset purchase agreement, allowed C&S to continue Penn Traffic's wholesale distribution division without interruption, to the same or substantially the same customers, out of the same warehouse facilities, and using the same infrastructure, procedures, and personnel as Penn Traffic, including all of the warehouse employees who were members of Teamsters Local 317.

54)   C&S therefore structured its takeover of Penn Traffic's wholesale distribution division in order to evade or avoid triggering or assuming pension withdrawal liability by, among other things, (i) electing not to comply with ERISA section 4204 (which provides that a sale to a *bona fide* purchaser who undertakes certain pension obligations does not trigger a "withdrawal" under ERISA), (ii) specifying in the asset purchase agreement that, following the takeover, the Teamsters union members would remain employees of Penn Traffic, and (iii)

requiring Penn Traffic to indemnify C&S for any pension withdrawal liability incurred as a result of the Transaction.

55) C&S's negotiations with Penn Traffic were not at arms'-length, due (in whole or in part) to some of Penn Traffic's executives and consultants' personal loyalties and financial ties to C&S.

56) Additionally, Surry actively advised Penn Traffic as it considered how to divest its business divisions to C&S and Tops. During that time, Surry was still actively advising C&S and has continued to be affiliated with C&S through at least 2015. For its part in the Transaction, Surry received a substantial fee.

57) Following execution of the asset purchase agreement, the Pension Fund requested that Penn Traffic provide information about the Transaction pursuant to ERISA section 1399(a). The Pension Fund made this request because it was concerned about protecting the pensions of the employees represented by Teamsters Local 317 at the Syracuse facilities.

58) Penn Traffic, however, refused to provide any information about the Transaction to the Pension Fund.

## The Aftermath

**The Operations**

59) Following the Transaction, C&S and Penn Traffic began transferring distribution volume from the Syracuse warehouses to the DuBois warehouses.

60) No business reason existed for transferring distribution volume from the Syracuse warehouses to the DuBois warehouses, and numerous owners of the independent stores C&S acquired as customers following its acquisition of Penn Traffic's distribution contracts expressed concern over the transfer.

61) Following C&S's takeover of Penn Traffic's wholesale distribution division, C&S directed, controlled, and benefited from the day-to-day activities of the Teamsters Local 317 members working at the Syracuse facilities, without whom C&S would have been unable to continue the wholesale distribution operations.

62) In particular, C&S employees stationed at the Syracuse warehouse directly instructed warehouse personnel (nominally still working for Penn Traffic) regarding the type and quantity of goods the Teamsters Local 317 members needed to select and deliver, to which of C&S's customers they needed to be delivered, and when those goods needed to arrive. Moreover, C&S employees personally met with warehouse personnel regarding changes and corrections that C&S thought should be made to the Teamsters Local 317 members' selection and routing of product.

63) Following the Transaction, substantially all of the inventory at the Syracuse warehouses was owned by C&S, and all of the distribution employees at the Syracuse warehouses serviced only C&S, which, in turn, paid for their services.

64) With the exception of the siphoning of product from the Syracuse warehouses to the DuBois warehouses, following the Transaction the operations at both warehouses were materially identical to what they would have been had C&S formally acquired the entirety of Penn Traffic's wholesale distribution division and become the employer of record of all of the Local 317 members.

65) Following the Transaction, Mr. Young informed the public that C&S's takeover of Penn Traffic's wholesale distribution division would allow Penn Traffic to focus on its retail division, restore Penn Traffic's profitability, and position Penn Traffic for long-term success.

66) In May 2009, Mr. Young received a $400,000 bonus for his part in Penn Traffic's sale of its warehouse distribution division to C&S. Five other Penn Traffic executives, some of whom were also formerly with C&S, split an additional $600,000 in bonuses between them.

67) These bonuses were not made in the normal course of business, and along with the non-arm's-length nature of the Transaction, drained resources from Penn Traffic.

68) In November 2009, only months after Penn Traffic's executives split at least $1,000,000 in bonuses and less than a year after C&S took over Penn Traffic's wholesale distribution division, Mr. Young's pronouncements proved false. Penn Traffic filed for Chapter 11 bankruptcy, leading ultimately to a liquidation of all of Penn Traffic's remaining assets, including Penn Traffic's retail division.

69) In the bankruptcy proceedings, C&S then aided Tops Markets to ensure that Tops Markets would be the successful bidder for Penn Traffic's retail division, *i.e.*, the same retail division that was the object of the C&S and Tops Markets' joint takeover discussions in early 2008.

70) On January 25, 2010, the bankruptcy court approved the sale of 79 Penn Traffic stores to Tops Markets. Thereafter, Tops Markets divested 3 of its newly acquired stores to Mr. Young and Mr. da Cunha, with the aid of a favorable supply contract with C&S, allowing Mr. Young and Mr. da Cunha to run their own grocery chain—where they remain today.

71) Tops Markets also acquired the right to formally control the DuBois warehouses, which it promptly transferred to C&S. The DuBois warehouses remain open and the employees there continued to be employed by C&S and/or C&S's wholly-owned subsidiary DuBois Logistics LLC.

**The Withdrawal**

72) After redirecting the supply of the stores formerly serviced from the Syracuse facilities, the operations at those facilities were wound down, and they ultimately closed on or about May 14, 2010.

73) When C&S caused the Syracuse facilities to cease operations, approximately 450 employees represented by Teamsters Local 317 at those facilities lost their jobs. Because those Teamsters Local 317 members were no longer employed and contributions to the Pension Fund ceased, the Pension Fund determined that a "complete withdrawal" from the Pension Fund had occurred, as defined in ERISA section 4203.

74) Following the withdrawal from the Pension Fund, the Pension Fund calculated the amount of withdrawal liability owing pursuant to ERISA section 4201.

75) In April 2010, through a proof of claim filed in the Penn Traffic bankruptcy proceedings, the Pension Fund delivered to Penn Traffic a notice and demand for payment of withdrawal liability, within the meaning of ERISA section 4219, in the amount of $63,592,689.25. C&S was on notice of the withdrawal liability claim filed by the Pension Fund.

76) In the bankruptcy proceedings, Penn Traffic disputed certain aspects of the Pension Fund's withdrawal liability claim, but Penn Traffic never contested the Pension Fund's assessment or determination of the amount of withdrawal liability. C&S also never contested the Pension Fund's assessment or determination of the amount of withdrawal liability, despite having actual knowledge of the withdrawal liability.

77) Penn Traffic did not initiate arbitration to dispute the Pension Fund's withdrawal liability determination pursuant to ERISA section 4221(a)(1). C&S also never initiated arbitration to dispute the withdrawal liability assessed by the Pension Fund.

78) Consequently, the amounts demanded by the Pension Fund became due and owing, pursuant to ERISA section 4221(b)(1).

79) At the time, the amount of withdrawal liability assessed by the Pension Fund was the single largest liability ever owed by an employer to the Pension Fund. This threatened the financial stability of the Plan and the benefits promised to the participants and beneficiaries.

80) As a result of Penn Traffic's bankruptcy proceedings, the Pension Fund received only $5,206,088.34 of the withdrawal liability, leaving a balance of **$58,386,600.91 in unpaid withdrawal liability** that is due and owing to the Pension Fund.

81) In sum, as contemplated from the start of the C&S, Tops Markets and Penn Traffic discussions in early 2008: (i) Penn Traffic ceased to exist; (ii) Top Markets took over most of Penn Traffic's retail stores; and (iii) C&S fully took over Penn Traffic's wholesale distribution division, including the DuBois warehouses, and continued to supply the independently-owned stores as well as the former Penn Traffic retail stores Tops Markets acquired. Additionally, the product at the Syracuse warehouses (which C&S had planned to close if Penn Traffic was unwilling or unable to pay its withdrawal liability) was shifted to other C&S warehouses.

82) C&S has not paid a penny in withdrawal liability to the Pension Fund.

83) Penn Traffic paid less than 10% of the withdrawal liability.

## COUNT I
## Withdrawal Liability as Successor to Penn Traffic

84) Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 83 above, as if fully rewritten herein.

85) At the time of the Transaction, and at all relevant times, C&S was aware that Penn Traffic was a contributing employer to the Pension Fund, that the Pension Fund was

15

underfunded, and that, if Penn Traffic's contributions ceased, a withdrawal would occur and withdrawal liability would become due.

86) C&S was aware of the approximate amount of withdrawal liability that would be triggered by Penn Traffic's withdrawal from the Pension Fund.

87) Following the Transaction, C&S continued Penn Traffic's wholesale distribution division in a continuous and uninterrupted fashion. Examples include, but are not limited to, the following:

    a) C&S maintained the same address and telephone number(s) and conducted business from the same facilities as Penn Traffic.

    b) C&S serviced the same customers that Penn Traffic once serviced.

    c) C&S conducted business using the same personnel as Penn Traffic. C&S became the direct employer of Penn Traffic employees once dedicated to Penn Traffic's wholesale distribution business, all of whom were non-union. C&S directed, controlled, and benefited from the Teamsters Local 317 members working at the Syracuse facilities.

88) As a matter of law, including federal common law as developed under ERISA, C&S is the successor to Penn Traffic, and it is jointly and severally liable for the outstanding withdrawal liability amounts due and owing to the Pension Fund following Penn Traffic's complete withdrawal from same, together with interest, costs, attorneys' fees, and any penalties related thereto.

### COUNT II
### Transaction to Evade or Avoid Withdrawal Liability

89) Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 88 above, as if fully rewritten herein.

90) The Transaction between C&S and Penn Traffic allowed C&S to continue Penn Traffic's wholesale distribution division in a continuous and uninterrupted fashion.

91) A principal purpose of the Transaction undertaken by C&S and Penn Traffic was to evade or avoid withdrawal liability, in violation of ERISA.

92) Accordingly, under ERISA section 4069(a) and/or ERISA section 4212(c), the withdrawal liability is to be determined and collected against C&S, which is liable for the unpaid balance of the withdrawal liability together with interest, costs, attorneys' fees and any penalties related thereto.

## COUNT III
### Entities Under Common Control

93) Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 92 above, as if fully rewritten herein.

94) Over more than a two-year period, C&S and Penn Traffic agreed to and jointly executed a plan to split up and temporarily run Penn Traffic's wholesale distribution business in order to avoid paying withdrawal liability.

95) Financial information regarding the performance of the nominally separate wholesale distribution business was kept (and existed separate and apart from either C&S or Penn Traffic's remaining lines of business). C&S and Penn Traffic each stood to realize a profit or loss based on the financial success of their wholesale distribution business.

96) Accordingly, under ERISA section 4001(b), C&S was in common control with Penn Traffic with respect to the Syracuse warehouse operations, which employed the employees, and it is jointly and severally liable for the outstanding withdrawal liability amounts due and owing to the Pension Fund following Penn Traffic's complete withdrawal from same, together with interest, costs, attorneys' fees, and any penalties related thereto.

## COUNT IV
## Withdrawal Liability as a Joint Employer

97) Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 96 above, as if fully rewritten herein.

98) In the contracts entered into in the Transaction, C&S purported to disclaim all obligations to the Pension Fund, including pension and withdrawal liability associated with the Teamsters Local 317 members working at the Syracuse facilities.

99) However, in those contracts C&S assumed the obligation to make payments to Penn Traffic, and those payments related to obligations that arose under the collective bargaining agreements or related agreements with the Pension Fund and/or the Teamsters Local 317.

100) Additionally, or in the alternative, through its course of conduct during and following the Transaction (including its relationship to and control over the Teamsters Local 317 members), C&S had a duty to the Pension Fund and the Teamsters Local 317 under applicable labor-management relations law.

101) Accordingly, under ERISA section 3(5) and/or ERISA section 4212(a), C&S had an obligation to contribute to the Pension Fund, and it is jointly and severally liable for the outstanding withdrawal liability amounts due and owing to the Pension Fund following Penn Traffic's complete withdrawal from same, together with interest, costs, attorneys' fees, and any penalties related thereto.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Court award judgment in favor of Plaintiffs with respect to Counts I, II, III and/or IV and order the following relief:

    a.    That C&S be ordered to pay to the Pension Fund the withdrawal liability owed to the Pension Fund in the amount of $58,386,600.91.

    b.    That C&S be ordered to pay to the Pension Fund, in addition to the withdrawal liability owed:

        (1)    Interest on the unpaid withdrawal liability from the date of first delinquency until payment at the annual rate of 11%;

        (2)    An award of double interest at the rate of 11%;

        (3)    Attorneys' fees and court costs; and

    c.    Such other legal and equitable relief against C&S as this Court deems just and appropriate.

Dated:   April 8, 2016                    Respectfully submitted,

                                             **PARAVATI, KARL, GREEN & DEBELLA, LLP**

                                             By:   */s/ Vincent M. DeBella*
Vincent M. DeBella, Esq., Bar Roll No. 101465
12 Steuben Park
Utica, New York 13501
P: (315) 735-6481
F: (315) 735-6406
E: vdebella@pkgdlaw.com

**GROOM LAW GROUP, CHARTERED**
Stephen M. Saxon, Esq. (admitted *pro hac vice*)
Edward J. Meehan, Esq. (admitted *pro hac vice*)
Mark C. Nielsen, Esq. (admitted *pro hac vice*)
1701 Pennsylvania Avenue, N.W.
Washington, DC  20006
P: (202) 857-0620
F: (202) 659-4503
E: ssaxon@groom.com
E: emeehan@groom.com
E: mcn@groom.com

*Counsel for Plaintiffs New York State Teamsters Conference Pension and Retirement Fund, et al.*

# **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 8th day of April, 2016, the foregoing First Amended Complaint was filed with the Clerk of Court via CM/ECF and served electronically upon:

Alan Kintisch
C&S Wholesale Grocers, Inc.
7 Corporate Drive
Keene, NH 03431
akintisc@cswg.com

Ashley D. Hayes
John G. Powers
Hancock Estabrook
100 Madison Street, Suite 1500
Syracuse, NY 13202
ahayes@hancocklaw.com
jpowers@hancocklaw.com

Evan Miller
Jacob M. Roth
Jenna P. Brofsky
Sara Pikofsky
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20005
202-879-3939
Fax: 202-626-1700
emiller@jonesday.com
yroth@jonesday.com
jbrofsky@jonesday.com
spikofsky@jonesday.com

*Counsel for Defendant*

**And by certified mail to**:

Office of the Chief Counsel
Pension Benefit Guaranty Corporation
1200 K Street, N.W.
Washington, DC 20005

          */s/ Edward J. Meehan*
         Edward J. Meehan, Esq. (admitted *pro hac vice*)