**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**NEW YORK STATE TEAMSTERS CONFERENCE**
**PENSION AND RETIREMENT FUND** by its
**Trustees, Michael S. Scalzo, Sr., John Bulgaro,**
**Daniel W. Schmidt, Tom J. Ventura, Bob Schaeffer,**
**Brian Hammond, Mark May and Paul Markwitz,**

                               **Plaintiff,**

               **v.**                                          **5:16-CV-84**
                                                       **(FJS/ATB)**

**C&S WHOLESALE GROCERS, INC.,**

                               **Defendant.**
_____

**APPEARANCES**                              **OF COUNSEL**

**GROOM LAW GROUP**                **EDWARD J. MEEHAN, ESQ.**
1701 Pennsylvania Avenue, N.W.        **MARK C. NIELSEN, ESQ.**
Suite 1200                            **STEPHEN M. SAXON, ESQ.**
Washington, D.C. 20006-5805
Attorneys for Plaintiff

**PARAVATI, KARL, GREEN,**        **VINCENT M. DEBELLA, ESQ.**
**& DEBELLA, LLP**
520 Seneca Street, Suite 105
Utica, New York 13502
Attorneys for Plaintiff

**C&S WHOLESALE GROCERS, INC.**    **ALAN KINTISCH, ESQ.**
7 Corporate Drive
Keene, New Hampshire 03431
Attorneys for Defendant

**HANCOCK ESTABROOK, LLP**        **ASHLEY D. HAYES, ESQ.**
1500 AXA Tower I                      **JOHN G. POWERS, ESQ.**
100 Madison Street
Syracuse, New York 13202
Attorneys for Defendant

**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Attorneys for Defendant

**EVAN MILLER, ESQ.**
**JACOB M. ROTH, ESQ.**
**SARA PIKOFSKY, ESQ.**

**SCULLIN, Senior Judge**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Pending before the Court is Defendant's motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Dkt. No. 23. Defendant filed this motion prior to Plaintiff amending its complaint as of right. After Plaintiff filed its amended complaint, the Court provided Defendant with the option to file a new motion to dismiss or to supplement its original motion. Defendant chose to supplement its original motion. Therefore, Defendant's motion, as supplemented, is directed at Plaintiff's amended complaint.

### II. BACKGROUND

Penn Traffic Company ("Penn Traffic") was a Syracuse-based food retail and wholesale company that operated under the "P&C Foods," "Bi-Lo Foods," and "Quality Markets" trade names. *See* Dkt. No. 28, First Amended Complaint, at ¶ 16. Penn Traffic owned two warehouses located in Syracuse, New York, and DuBois, Pennsylvania. *See id.* at ¶ 17. At the Syracuse warehouse, Penn Traffic employed approximately 450 members of Teamsters Local 317. *See id.* at ¶ 19. Penn Traffic was a party to "various collective bargaining agreements with Teamsters Local 317." *See id.* at ¶ 20. Relevant to this litigation, Penn Traffic was required to contribute to a pension fund on behalf of employees who worked at the Syracuse warehouse and whom Teamsters Local 317 represented. *See id.* at ¶ 20.

Plaintiff Pension Fund is managed by a Board of Trustees and regulated pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") and the Labor Management Relations Act ("LMRA"). *See id.* at ¶ 9. Plaintiff Pension Fund is organized as a "multiemployer plan," which means that Penn Traffic is one of several employers who contribute to Plaintiff Pension Fund. *See id.* Penn Traffic's participation in Plaintiff Pension Fund exposed it to substantial withdrawal liability if it ceased making contributions. *See id.* at ¶ 30.

In May 2010, after filing for bankruptcy, Penn Traffic fired all 450 employees whom Teamsters Local 317 represented and permanently closed its Syracuse warehouse. *See id.* at ¶ 73. Since the Teamsters Local 317 members were no longer employed, Penn Traffic was no longer making any contributions to Plaintiff Pension Fund. *See id.* Thus, Penn Traffic triggered withdrawal liability pursuant to ERISA. *See id.*

In April 2010, Plaintiff Pension Fund delivered a notice and demand for payment of the withdrawal liability in the amount of $63,592,689.25 to Penn Traffic. *See id.* at ¶ 75. Penn Traffic did not contest the amount of withdrawal liability. *See id.* at ¶ 80. As a result of Penn Traffic's bankruptcy proceedings, however, Plaintiff Pension Fund only received $5,206,088.34, leaving a balance of $58,386,600.91 in unpaid withdrawal liability. *See id.* at ¶ 80. Plaintiff Pension Fund commenced this action in an attempt to recover the unpaid funds, not from Penn Traffic, which is not a party to this lawsuit, but from Defendant.

Defendant is a national wholesale supply company. *See id.* at ¶ 13. Around March 2008, Defendant began negotiations to acquire Penn Traffic's wholesale distribution division. *See id.* at ¶ 29. One complication in Defendant's plan was that an outright purchase of Penn Traffic's Syracuse warehouse would trigger Penn Traffic's withdrawal liability, a result Defendant wanted to avoid.

*See id.* at ¶¶ 42-43. Therefore, Defendant attempted to structure the takeover to foreclose exposure to Penn Traffic's withdrawal liability – a strategy that Plaintiff Pension Fund deems an actionable scheme and Defendant labels "prudent business judgment." *See id.*

In December 2008, Defendant entered into an asset purchase agreement and other agreements to assume control of specified assets and liabilities within Penn Traffic's wholesale distribution division. *See* Dkt. No. 28 at ¶ 51. "[Defendant] acquired, *inter alia*, Penn Traffic's wholesale distribution contracts, customers, equipment, files, records, goodwill, intellectual property, accounts receivable, and employees dedicated to Penn Traffic's wholesale distribution division who were <u>not</u> members of Teamsters Local 317." *See id.* at ¶ 52; *see also* Dkt. No. 23-3, Miller Declaration Exhibit "A" at § 1.2(a)-(h) (listing acquired assets), § 4.21(c) (providing that Defendant would hire only those Penn Traffic employees not subject to collective bargaining agreements). However, Defendant did not acquire, among other things, Penn Traffic's retail business, facilities, leases and subleases, cash, and employee benefit plans. *See id.* at § 1.3(a)-(e). Furthermore, Defendant specifically disclaimed any authority or power over any of Penn Traffic's employees who were associated with Teamsters Local 317. *See* Dkt. No. 23-4, Miller Declaration Exhibit "B" at § 10.

These agreements created an "independent contractor" relationship between Penn Traffic and Defendant. *See id.* Defendant shipped merchandise to Penn Traffic's warehouses, including the Syracuse warehouse; and Penn Traffic stored, handled, and ultimately distributed the merchandise to Defendant's customers. *See id.* at § 1.2. Under the contract, Penn Traffic retained responsibility for "all employees, Facility and storage leases, material handling and transportation equipment, contracts and all other liabilities associated with the Facilities and any other storage." *See id.*

According to Plaintiff, operations at the Syracuse warehouse "were materially identical to what they would have been had [Defendant] formally acquired the entirety of Penn Traffic's wholesale distribution." *See* Dkt. No. 28 at ¶ 64. The only difference was that Penn Traffic continued to operate independently and remained the employer of record for all 450 Teamsters Local 317 employees. *See id.*

Finally, Plaintiff alleges, and Defendant does not dispute, that Defendant's plan was to acquire Penn Traffic's wholesale business without becoming responsible for Penn Traffic's withdrawal liability. *See* Dkt. No. 42 at 4. Plaintiff claims that Defendant "modified the deal structure for no reason other than shirking pension obligations to the Syracuse employees and the Pension Fund." *See id.*; *see also* Dkt. No. 28 at ¶¶ 24-28.

### III. DISCUSSION

**A.    Standard of review**

Courts use a two-step process when addressing a Rule 12(b)(6) motion. "First, they isolate the moving party's legal conclusions from its factual allegations." *Hyman v. Cornell Univ.*, 834 F. Supp. 2d 77, 81 (N.D.N.Y. 2011). Second, they accept factual allegations as true and "determine whether [those allegations] plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). A pleading must contain more than a "blanket assertion[] of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007). Thus, to withstand a motion to dismiss, a pleading must be "'plausible on its face'" such that it contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Iqbal*, 556 U.S. at 678 (quotation and other citation omitted).[1]


**B.      Plaintiff's first amended complaint**

Plaintiff asserts four claims against Defendant.  In its first cause of action, Plaintiff alleges that Defendant is responsible for Penn Traffic's withdrawal liability as the successor to Penn Traffic. *See* Dkt. No. 28 at ¶¶ 84-88.  Specifically, Plaintiff claims that Defendant was aware of Penn Traffic's withdrawal liability and understood the approximate amount of liability to expect. *See id.* at ¶¶ 84-86.  Furthermore, Plaintiff asserts that Defendant maintained the same address, telephone number and facility as Penn Traffic, serviced the same customers as Penn Traffic, and used the same personnel as Penn Traffic. *See id.* at ¶ 87.  Therefore, according to Plaintiff, under federal common law, Defendant is jointly and severally liable for the outstanding withdrawal liability. *See id.* at ¶ 88.

In its second cause of action, Plaintiff alleges that "a principal purpose of the Transaction undertaken by [Defendant] and Penn Traffic was to evade or avoid withdrawal liability, in violation of ERISA." *See id.* at ¶ 91.  Thus, according to Plaintiff, under ERISA, Defendant is liable for the balance of the withdrawal liability together with interest, costs, attorney's fees and penalties. *See id.* at ¶ 92.

---

[1] When addressing a Rule 12(b)(6) motion, a court may "consider documents attached to or incorporated by reference in [a] complaint[.]" *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998) (citation omitted).  Even where "'a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint,' the court may . . . take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (quotation omitted). Since the contracts between Penn Traffic and Defendant are integral to Plaintiff's amended complaint, the Court will consider them when addressing the pending motion.

In its third cause of action, Plaintiff contends that Defendant was an employer under ERISA in "common control" with Penn Traffic and is thus jointly and severally liable for withdrawal liability. *See id.* at ¶ 96. To support this claim, Plaintiff asserts that Defendant and Penn Traffic jointly executed a plan to split up Penn Traffic's wholesale distribution business to avoid liability. *See id.* at ¶ 94. Furthermore, Plaintiff argues that Defendant and Penn Traffic kept financial information about the Syracuse facility separate from their other business lines and stood to realize a profit based on the business. *See id.* at ¶ 95.

Finally, in its fourth cause of action, Plaintiff alleges that Defendant shares liability as a joint employer. *See id.* at ¶¶ 97-101. Plaintiff claims that Defendant made payments to Penn Traffic that were related to obligations under the collective bargaining agreement. *See id.* at ¶ 99. Alternatively, Plaintiff argues that Defendant had a "duty" to Plaintiff under applicable law. *See id.* at ¶ 100.

## C.     Plaintiff's first cause of action – successor liability

As a preliminary matter, the Court must determine whether the theory of successor liability applies to withdrawal liability under ERISA. The Second Circuit has not squarely addressed this issue.[2] However, the Second Circuit, as well as other circuits, has applied successor liability in addressing delinquent contributions under ERISA. *See Stotter Div. of Graduate Plastics Co., Inc. v. Dist. 65, United Auto Workers, AFL-CIO*, 991 F.2d 997, 1002 (2d Cir. 1993); *Einhorn v. M.L. Ruberton Constr. Co.*, 632 F.3d 89, 99 (3d Cir. 2011); *Upholsterers' Int'l Union Pension Fund v.*

---

[2] At least one district court in the Second Circuit, however, has applied successor liability in the context of a claim for withdrawal liability. *See Burke v. Hamilton Installers, Inc.*, No. 02 CV 519 A, 2004 WL 1946457, *6 (W.D.N.Y. Aug. 31, 2004) (citing *Truck Drivers Union v. Tasemkin, Inc.*, 59 F.3d 48 (7th Cir. 1995)).

*Artistic Furniture of Pontiac*, 920 F.2d 1323, 1327 (7th Cir. 1990); *Trs. for Alaska Laborers-Constr. Indus. Health & Sec. Fund v. Ferrell*, 812 F.2d 512, 516 (9th Cir. Cir. 1987). In this regard, the Ninth Circuit has held that

> [t]he primary reason for making a successor responsible for its predecessor's delinquent ERISA contributions is that, "[a]bsent the imposition of successor liability, present and future employer participants in the union pension plan will bear the burden of [the predecessor's] failure to pay its share," which will threaten the health of the plan while the successor reaps a windfall.

*Resilient Floor Covering Pension Trust Fund Bd. of Trustees v. Michael's Floor Covering, Inc.*, 801 F.3d 1079, 1093 (9th Cir. 2015) (quoting *Artistic Furniture*, 920 F.2d at 1328).

Defendant attempts to distinguish cases applying successor liability to delinquent contributions by observing that delinquent contributions are *extant* liabilities under a contract, whereas withdrawal liability is a *contingent* liability arising under ERISA. *See* Dkt. No. 23-1 at 27 n.3. However, withdrawal liability under ERISA's Multiemployer Pension Plan Amendment Act of 1980 ("MPPAA") is mandatory, not contingent. *See Textile Workers Pension Fund v. Standard Dye & Finishing Co., Inc.*, 725 F.2d 843, 857 (2d Cir. 1984) (stating that "[t]he MPPAA modified those existing provisions to effect mandatory – rather than contingent – withdrawal liability"). That being said, the fact that withdrawal liability does not become due until a company withdraws from the plan might be relevant in determining whether a successor had notice of a predecessor's withdrawal liability, *see Bd. of Trs. of Auto. Mechanics' Local No. 701 Union & Indus. Pension Fund v. Full Circle Grp., Inc.*, 826 F.3d 994, 997 (7th Cir. 2016) (holding that a successor had notice of a predecessor's withdrawal liability merely by knowing that the predecessor employed union workers), but it does not preclude applying successor liability to withdrawal liability in the first instance.

Those circuits that have addressed the issue of whether successor liability applies to

withdrawal liability concluded that it did.  *See Tsareff v. ManWeb Servs., Inc.*, 794 F.3d 841, 847 (7th Cir. 2015); *Resilient Floor Covering*, 801 F.3d at 1094 (finding that the rationale to apply successor liability to delinquent contributions under ERISA applied "with equal, if not greater, force" to withdrawal liability).  In *Tsareff*, the Seventh Circuit reasoned that "[s]uccessor liability is an equitable doctrine, *Tasemkin*, 59 F.3d at 49, and in every instance where we have found the imposition of federal successor liability to be appropriate, we have done so after carefully balancing the need to vindicate important federal statutory policies with equitable considerations." *Tsareff*, 794 F.3d at 845.  Likewise, the Ninth Circuit noted that "[a] primary purpose of ERISA is 'to ensure that employees and their beneficiaries [a]re not . . . deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans.'" *Resilient Floor Covering*, 801 F.3d at 1094 (quoting *R.A. Gray & Co.*, 467 U.S. at 722, 104 S. Ct. 2709). Therefore, in *Resilient Floor Covering*, the Ninth Circuit held that "a bona fide successor can be liable for its predecessor's MPPAA withdrawal liability . . . so long as the successor had notice of the liability." *Id.* at 1095 (footnote omitted); *see also Full Circle Grp., Inc.*, 826 F.3d at 998 (explaining that there is "no reason . . . to allow the successor company to obtain a windfall by acquiring assets free of liabilities, leaving its predecessor with liabilities but no assets").

Defendant argues that this Court should not follow the Seventh and Ninth Circuits because ERISA already has a "'detailed statutory scheme for allocating responsibility for withdrawal liability between seller and purchaser in a sale of assets.'"[3]  *See* Dkt. No. 23-1 at 26 (quoting *Cent. States, Se.*

---

[3] Under § 1384, an employer's sale of assets does not result in withdrawal liability as long as the sale meets the following requirements: (1) it must be a bona fide, arm's-length sale, *see* 29 U.S.C. § 1384(a)(1); (2) the purchaser must have an obligation "for substantially the same number of contribution base units for which the seller had an obligation to contribute to the

(continued...)

& *Sw. Areas Health & Welfare Fund v. Cullum Cos., Inc.*, 973 F.2d 1333, 1337 (7th Cir. 1992)).

However, ERISA's statutory scheme does not address how to allocate responsibility for withdrawal liability *after* it has been assessed; rather, "[i]f the requirements of section 1384 are met, an employer's sale of assets is *not considered a withdrawal* from the pension fund." *Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Cullum Cos., Inc.*, 973 F.2d 1333, 1337 (7th Cir. 1992) (emphasis added).  Under § 1384, a purchaser assumes the obligation to contribute to the fund and becomes primarily liable for future withdrawal liability, while the seller remains secondarily liable. *See id.*  Thus, § 1384 is, "'in effect, a "safe harbor" protecting an employer from withdrawal liability with respect to a sale of assets that meets certain requirements, all of which are designed to shift the obligation for contributions to the purchaser while leaving the seller secondarily liable for a five-year period after the sale.'"  *Id.* (quoting *I.A.M. National Pension Fund v. Clinton Engines, Corp.*, 825 F.2d 415, 420 (D.C. Cir. 1987)).  Therefore, § 1384 does not preclude applying successor liability to withdrawal liability.  *See Resilient Floor Covering*, 801 F.3d at 1094 (stating that, "[a]lthough § 1384 establishes one circumstance in which an employer who might – but would not necessarily – otherwise fit into the successor category is *not* liable for withdrawal payments, it does not address whether the broader employment and labor law successorship doctrine applies where those stringent conditions are not met").

The Court finds the reasoning of the Seventh and Ninth Circuits persuasive and, therefore, finds that the theory of successor liability is applicable to withdrawal liability under ERISA.

---

[3](...continued)
plan," 29 U.S.C. § 1384(a)(1)(A); (3) the purchaser must provide a bond to secure its contribution obligation, *see* 29 U.S.C. § 1384(a)(1)(B); and (4) the seller must remain secondarily liable for withdrawals that occur within five years after the sale, *see* 29 U.S.C. § 1384(a)(1)(C).

Accordingly, the Court must consider whether Plaintiff has alleged sufficient facts to support a plausible claim of successor liability against Defendant.

Defendant argues that successor liability is not applicable to this case because, in light of the fact that Penn Traffic continued to exist and operate independently after the asset sale, Defendant could not have succeeded Penn Traffic. *See* Dkt. No. 23-1 at 24. In this regard, Defendant asserts that the "test [for successor liability] presupposes a 'predecessor' that ceases 'operations,' which are then 'continued' by the asset-purchaser." *See id.* at 23.

There do not appear to be any cases in which courts have expressly addressed whether withdrawal liability would apply in situations in which two companies exist simultaneously. However, the Third Circuit has found that successor liability can be applied to delinquent ERISA contributions despite the selling company remaining "in business for some time after the asset sale[.]" *Einhorn*, 632 F.3d at 92. The facts in *Einhorn* are somewhat similar to those in the present case. In *Einhorn*, Statewide, a highway construction company, was facing financial difficulties and allegations of fraud. *See id.* at 91. During this time, Statewide was a party to two collective bargaining agreements ("CBA"), which bound it to contribute to two multiemployer benefit plans established under ERISA. *See id.* Moreover, Statewide had delinquencies owed under both the aforementioned CBAs. *See id.* Ruberton, a general construction company, learned of Statewide's troubles and entered into negotiations to purchase its assets. *See id.* During these discussions, Ruberton specified that its objective was to ensure that it would not be held to be the successor to Statewide and, therefore, liable for Statewide's delinquent contributions. *See id.* at 92. To that effect, Ruberton agreed to hire, subject to need, Statewide's existing workforce, which was covered by the existing CBA, and to negotiate a new CBA in the future. *See id.* On October 10, 2005,

Statewide sold its assets to Ruberton for $1.6 million in cash.  *See id.*  Ruberton then began to make

contributions to the fund.  *See id.*  "Statewide remained in business for some time after the asset sale

using subcontractors to provide the necessary equipment and labor.  Ruberton was one such

subcontractor, billing Statewide more than $400,000 for rented employees and equipment."  *Id.*  In

January 2006, Statewide ceased all operations.  *See id.*

On December 13, 2005, the pension funds filed an action against Statewide and Ruberton,

seeking to recover the delinquent contributions.  *See id.* at 93.  Statewide initially agreed to pay all

of the delinquents funds but was unable to do so because it became insolvent.  *See id.*  Thereafter,

the pension funds filed a new action against Ruberton for the delinquent contributions, alleging that

Ruberton was Statewide's successor and thus liable.  *See id.*

The Third Circuit, although not expressly mentioning the simultaneous existence of

Statewide and Ruberton, held that successor liability was applicable to suits seeking delinquent

contributions under ERISA and might be available in the case before it.  Ultimately, the Third

Circuit remanded to the district court to consider the substantial continuity test, focusing on the

following factors: "continuity of the workforce, management, equipment and location; completion

of work orders begun by the predecessor; and constancy of customers."  *Id.* at 99 (citing *Fall River

Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 43, 107 S. Ct. 2225, 96 L. Ed. 2d 22 (1987);

*Artistic Furniture*, 920 F.2d at 1329).  Importantly, the Third Circuit held that, unlike the *de facto*

merger and mere continuation exceptions at traditional common law,[4] "commonality of ownership is

_____

[4] The mere continuation test "requires the existence of a single corporation after the
transfer of assets, with an identity of stock, stockholders, and directors between the successor and
predecessor corporations."  *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 519 (2d Cir. 1996),
*overruled on other grounds by New York v. Nat'l Serv. Indus., Inc.*, 352 F.3d 682, 685 (2d Cir.
(continued...)

-12-

not required" under the substantial continuity test, *id.* (citations omitted), insinuating that parallel existence was not an obstacle to imposing liability based on the substantial continuity doctrine.

Moreover, the Supreme Court has suggested that "the real question in each of these 'successorship' cases is, on the particular facts, what are the legal obligations of the new employer to the employees of the former owner or their representative?" *Howard Johnson Co., Inc. v. Detroit Local Joint Exec. Bd., Hotel & Rest. Emps. & Bartenders Int'l Union, ALF-CIO*, 417 U.S. 249, 262 n.9 (1974). In *Howard Johnson*, the Court recognized that "[t]he answer to this inquiry requires analysis of the interests of the new employer and the employees and of the policies of the labor laws in light of the facts of each case and the particular legal obligation which is at issue," which, in *Howard Johnson*, was the duty to pay withdrawal liability. *Id.* Thus, the Court emphasized that there was "no single definition of 'successor' which is applicable in every legal context. A new employer, in other words, may be a successor for some purposes and not for others."[5] *Id.* (citations omitted)

In the context of withdrawal liability, the primary reason for making a successor responsible for resulting withdrawal liability is that, "'[a]bsent the imposition of successor liability, present and future employer participants in the union pension plan will bear the burden of [the predecessor's] failure to pay its share,' which will threaten the health of the plan while the successor reaps a

_____

[4](...continued)
2003) (citation omitted).

[5] Ultimately given the factual context in *Howard Johnson*, the Court found that the defendant could not be bound as a successor to the prior company's duty to arbitrate, noting that in that particular legal context the most important factor to consider was whether the new employer employed the same employees. *See Howard Johnson*, 417 U.S. at 260. However, the Court stated that the defendant had succeeded in some aspects of the other business despite only purchasing limited assets and leaving the other business largely intact. *See id.* at 262 n.9.

-13-

windfall." *Resilient Floor Covering*, 801 F.3d at 1093 (quoting *Artistic Furniture*, 902 F.2d at 1328). Furthermore, a primary purpose of ERISA is "to ensure that employees and their beneficiaries [a]re not . . . deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984) (citations omitted). A strict rule that forecloses applying successor liability for the singular reason that the selling company continues to exist nominally would create an arbitrary impediment to a doctrine that has its foundation in equity and flexibility. *See Resilient Floor Covering*, 801 F.3d at 1093 (stating that "[t]he successorship standards are flexible and must be tailored to the circumstances at hand"). Therefore, the Court finds that the same policy considerations that favor applying successor liability to withdrawal liability in the first place favor rejecting Defendant's formalistic argument that successor liability cannot exist absent the dissolution of a seller in a partial asset sale. *See Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1220 (2d Cir. 1987) (stating that "[c]ourts have without difficulty disregarded form for substance where ERISA's effectiveness would otherwise be undermined").

In addition to the aforementioned policy considerations, the statutory scheme imposing withdrawal liability favors applying successor liability to parallel companies. Withdrawal liability is triggered when an employer "(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a). Axiomatically, withdrawal liability is triggered at the end of the life of a business or entity. Defendant's position would create a loophole where businesses would merely insist on keeping the predecessor afloat for a period of time after an asset sale to avoid withdrawal liability. Successor liability, however, is not about drawing lines in the sand; rather, it is an equitable doctrine that

flexes and bends based "upon the totality of the circumstances of a given situation" and the federal

rights at stake. *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 43 (1987).[6]

Accordingly, the Court concludes that, although Penn Traffic did not cease to exist after its

asset sale to Defendant and both Penn Traffic and Defendant existed simultaneously, this does not

necessarily foreclose Plaintiff from relying on a successor liability theory as a basis for its claims

against Defendant. That being said, however, to withstand a motion to dismiss, Plaintiff must allege

sufficient facts to assert a plausible claim of successor liability against Defendant.

An entity has successor liability where "(1) it 'had notice of its predecessor's obligations' and

(2) '"a sufficient continuity of identity" exists between the two businesses.'" *Romita v. Anchor Tank

Lines, LLC*, No. 11 Civ. 9641, 2014 WL 1092867, *4 (S.D.N.Y. Mar. 17, 2014) (quoting *Bd. of Trs.

of the Sheet, Metal Workers Local Union No. 137*, 1995 U.S. Dist. LEXIS 9330, at *3, 1995 WL

404873 (quoting *Stotter Div. of Graduate Plastics*, 991 F.2d at 1002-03)) (other citation omitted).

This determination "is primarily factual in nature and is based upon the totality of the circumstances

---

[6] The Court notes that, because there are many similarities between alter ego liability and successor liability, cases discussing alter ego liability are helpful to determine the applicability of successor liability. *See, e.g., Full Circle Grp., Inc.*, 826 F.3d at 998 (noting that, "if fraudulent intent is subtracted as a factor [to determine whether there is alter ego liability,] all that is left are factors that establish successor liability")*; Ret. Plan of UNITE HERE Nat'l Ret. Fund v. Kombassan Holding A.S.*, 629 F.3d 282, 288 (2d Cir. 2010) (rejecting the defendant's argument that "alter ego status [could not] apply where the entities exist[ed] simultaneously"); *Massachusetts Carpenters Cent. Collection Agency v. Belmont Concrete Corp.*, 139 F.3d 304, 307-08 (1st Cir. 1998) (stating that, "[a]lthough developed in the labor law context, alter ego or successor liability analysis has been applied to claims involving employee benefit funds brought under ERISA and the LMRA" and that, "although the alter ego doctrine is primarily applied in situations involving successor companies, 'where the successor is merely a disguised continuance of the old employer,' . . . it also applies to situations where the companies are parallel companies" (citations omitted)); *Roofers Local 195 Pension, Health & Accident, Annuity & Joint Apprenticeship Training Funds v. Shue Roofing Inc.*, No. 5:01-CV-562, 2004 WL 395893, *1 n.2 (N.D.N.Y. Feb. 3, 2004) (finding that both alter ego and successor liability applied to the facts of the case).

of a given situation[; successor liability thus] requires that the [court] focus on whether the new company has 'acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations.'" *Fall River*, 482 U.S. at 43 (quotation omitted).

As to the issue of notice, Plaintiff asserts that Penn Traffic provided Defendant with estimates of the withdrawal liability; Defendant commissioned studies of its own to estimate withdrawal liability; and Defendant would not agree to the asset purchase if it had to assume that liability. *See* Dkt. No. 28 at ¶¶ 32, 34, 39; *see also Full Circle Grp., Inc.*, 826 F.3d at 997 (holding that mere knowledge that predecessor was unionized was sufficient to alert the buyer to the possibility of withdrawal liability); *Battino v. Cornelia Fifth Ave., LLC*, 861 F. Supp. 2d 392, 407 (S.D.N.Y. 2012) (holding a company had notice when it was fully aware of potential liabilities).

Furthermore, with regard to the issue of continuity, Plaintiff alleges that, after Defendant took over Penn Traffic's warehouse, operations continued in the same manner as before. *See* Dkt. No. 28 at ¶ 87. For instance, Defendant used the same warehouse, fulfilled the same contracts, used the same inventory, and maintained the same workforce to complete the job. *See id.* at ¶¶ 52, 53, 62, 64. Plaintiff also alleges that Defendant maintained the same address and became the direct employer of all former Penn Traffic non-union employees. *See id.* at ¶ 87.

Finally, for successor liability to apply in this factual context, the Court must give special consideration to Defendant's relationship with the work that the union employees completed. *See Howard Johnson*, 417 U.S. at 262 n.9. In this regard, Plaintiff maintains that, although Penn Traffic nominally continued as the employer of record for the union members, Defendant directed, controlled, and benefitted from all union members. *See id.* at ¶¶ 46-47, 87. In sum, Plaintiff alleges

that Penn Traffic and Defendant were doing essentially the same job, under the same working conditions, with the same supervisors, the same employees, the same production process, and serving the same customers. *See Resilient Floor Covering*, 801 F.3d at 1095 (listing factors to consider to determine substantial continuity).

Accepting Plaintiff's allegations as true as it must at this stage of the litigation, the Court finds that Plaintiff has pled a plausible claim against Defendant based on a theory of successor liability. Therefore, the Court denies Defendant's motion to dismiss Plaintiff's first cause of action.

**D.    Plaintiff's second cause of action – evade or avoid liability**

With regard to Plaintiff's second cause of action, the parties' dispute focuses on the proper interpretation of 29 U.S.C. § 1392(c). To support its position, Plaintiff relies on the Second Circuit's holding in *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049 (2d Cir. 1993). As in this action, the plaintiff in *Herrmann* was a multi-employer pension fund ("Fund"). The defendants were Lock Manufacturing, Inc. ("Manufacturing"), Thomas Herrmann ("Herrmann"), and Lock Mowers, Inc. ("Mowers"). Hermann became the president and sole shareholder of Manufacturing in October 1986. At that time, Manufacturing was bound to make contributions to the Fund. Later, in November 1988, Mowers "offered to acquire the business and certain assets of Manufacturing[.]" *Id.* at 1053. Then, in April 1989, Mowers, Manufacturing, and Herrmann entered "into the acquisition agreement pursuant to which Mowers purchased Manufacturing's assets, but did not assume liability 'actual or contingent, whatsoever, including, without limitation, for any withdrawal liability of Seller under any multiemployer pension plan.'" *Id.* (quotation omitted). The Second Circuit noted that

the Fund allege[d] that the parties dropped the purchase price to $350,000 and gave Herrmann at $50,000 signing bonus instead. It is also alleged that Herrmann received a one year service arrangement for $75,000 and over $370,000 payable over three years for a covenant not to compete. Prior to the asset sale, Herrmann used a Manufacturing line of credit to pay himself an extra bonus of more than $250,000. *These transactions allegedly rendered Manufacturing insolvent.*

*Id.* (emphasis added).

One month after the sale was complete, in May 1989, "Manufacturing ceased operations and effectuated a complete withdrawal from the Fund." *Id.* In essence, after Mowers paid Manufacturing and Herrmann for the assets, Herrmann drove the business into bankruptcy. The Fund subsequently sent Manufacturing a demand for withdrawal liability amounting to $636,098. *See id.* Since Manufacturing was unable to make any payments, the Fund sued Manufacturing, Herrmann, and Mowers based on 29 U.S.C. § 1451(a)(1), which provides, that

> [a] plan fiduciary, employer, plan participant, or beneficiary, who is adversely affected by *the act or omission of any party under this subtitle with respect to a multiemployer plan*, or an employee organization which represents such a plan participant or beneficiary for purposes of collective bargaining, may bring an action for appropriate legal or equitable relief, or both.

29 U.S.C. § 1451(a)(1) (emphasis added).

According to the plaintiff in *Herrmann*, the defendants "participated in a scheme, the principal purpose of which was to evade or avoid withdrawal liability by depriving Manufacturing of funds sufficient to meet its pension liability." *Herrmann*, 9 F.3d at 1056 (citations omitted).

Reading §§ 1451(a)(1) and 1392(c)[7] together, the Second Circuit held that,

---

[7] Section 1392(c) provides that, "[i]f a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and

(continued...)

if a pension fund (such as the Fund in this case) is adversely affected by the acts of any party who has attempted to "evade or avoid liability" under the MPPAA (such as Manufacturing, Mowers or Herrmann), then the MPPAA shall be applied "without regard to such transaction." To calculate *and* collect liability, "without regard to such transaction," any assets that were transferred in order to "evade or avoid liability," as well as the parties to whom they were improperly transferred, must be within the reach of the statute. *Further, to apply the MPPAA "without regard to such transaction," the transferor entity must be deemed to be in possession of improperly transferred assets. Those assets must therefore be recoverable from the parties to whom they have been illegitimately transferred.* Those parties thus become "part[ies] under this subtitle" within the meaning of § 1451(a)(1). . . .

*Id.* (citation omitted) (emphasis added).

According to the Second Circuit, the main focus of § 1392(c) is to give a pension fund a tool to recapture assets when a company bankrupts itself in lieu of paying its withdrawal liability. In other words, § 1392(c) applies when Company A, which is bound to make contributions to a fund, illicitly sells its assets to Company B, and Company A then uses the proceeds of that sale to pay large bonuses to its executives, emptying Company A's coffers and thereby forcing Company A into bankruptcy. "Those assets must therefore be recoverable from the parties to whom they have been illegitimately transferred," *id.*, i.e., the assets Company A illicitly sold to Company B and the bonuses that Company A paid to its executives.

This reading of *Herrmann* comports with the plain language of the statute. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (stating that "we begin with the understanding that Congress 'says in a statute what it means and means in a statute what it says there'" (quotation omitted)). To reiterate, § 1392(c) provides as follows: "If a principal purpose

---

[7](...continued)
collected) without regard to such transaction." 29 U.S.C. § 1392(c).

-19-

of any transaction is to evade or avoid liability under this part, this part shall be applied (*and liability shall be determined and collected*) without regard to such transaction." 29 U.S.C. § 1392(c) (emphasis added).

To support its position, Defendant argues that, because Penn Traffic retained its withdrawal liability, Penn Traffic did not evade or avoid its liability, and Defendant had nothing to evade or avoid in the first place because it was never obligated to make contributions. *See* Dkt. No. 23-1 at 17. Both the Second Circuit's decision in *Hermann* and the statute itself foreclose this interpretation of § 1392(c). *See Herrmann*, 9 F.3d at 1056 (holding third parties liable even when the original party retained its liability); 29 U.S.C. § 1392(c) (using the words "any party" rather than the more specific "employer" that Defendant's interpretation would import); *see also New York State Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 647 n.6 (2d Cir. 2005) (finding that non-employers may be held liable under § 1392 (citations omitted)).

Defendant next argues that "[t]he sole remedy for an evade-or-avoid transaction is to disregard the transaction." *See* Dkt. No. 23-1 at 19. According to Defendant, that would mean setting aside the transaction and leaving Penn Traffic and Defendant in the positions they would have been in had the transaction never occurred. *See id.* at 19-20. In this regard, Defendant contends that the court is not entitled to "'writ[e] in new terms to a transaction or create a transaction that never existed.'" *See id.* at 20 (quoting [*Sun Capital Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*, 724 F.3d 129,] 149 [(1st Cir. 2013)]). This argument, however, ignores the parenthetical statement "(and liability shall be determined and collected) without regard to that transaction." 29 U.S.C. § 1392(c). Therefore, despite Defendant's argument to the contrary, the Court finds that the remedy is not to ignore the transaction completely but, rather, to determine

-20-

and collect liability without reference to that transaction. That is exactly what the court in *Herrmann* authorized, holding that, to "collect" the withdrawal liability the assets transferred to evade or avoid liability "must . . . be recoverable from the parties to whom they have been illegitimately transferred." *Herrmann*, 9 F.3d at 1056. Accordingly, the Court concludes that, consistent with the Second Circuit's holding in *Herrmann*, the statute should be read to allow a pension fund to "determine and collect" funds illicitly transferred in an attempt to evade or avoid withdrawal liability.

In this case, Plaintiff alleges that Penn Traffic's executives received $1 million in bonuses for closing the deal with Defendant. *See* Dkt. No. 28 at ¶¶ 44, 66. However, those individuals are not parties to this suit nor does Plaintiff allege with any particularity that the bonuses were paid in an effort to funnel money away from a company that was on the precipice of being assessed withdrawal liability as was the case in *Herrmann*.[8] Furthermore, in this case, Defendant paid Penn Traffic more than $27 million for the asset sale, *see id.*; *see also* Dkt. No. 23-3 at § 3.1 (stating that the purchase price was $27,600,000.00); and, despite bankruptcy, Penn Traffic was still able to pay more than $5 million to the Pension Fund, *see* Dkt. No. 28 at ¶ 80. In other words, although Penn Traffic and Defendant might have structured the transaction so that Defendant could avoid the assumption of Penn Traffic's withdrawal liability, they did not structure the transaction so that Penn Traffic became immediately insolvent and unable to pay withdrawal liability. In fact, the opposite is true, "[f]ollowing the Transaction, [Penn Traffic's CEO] informed the public that [Defendant's] takeover of Penn Traffic's wholesale distribution division would allow Penn Traffic to focus on its

---

[8] In *Herrmann* the parties entered into the acquisition agreement on April 10, 1989, and Manufacturing ceased operations on May 9, 1989, *see Herrmann*, 9 F.3d at 1053; whereas, in this case, Penn Traffic continued in business for eighteen months.

retail division, restore Penn Traffic's profitability, and position Penn Traffic for long-term success." *See id.* at ¶ 65.

Accordingly, for all these reasons, the Court finds that Plaintiff has not stated a plausible claim under 29 U.S.C. §§ 1392(c), 1451(a)(1) and grants Defendant's motion to dismiss Plaintiff's second cause of action.

**E.     Third cause of action - common control liability**

Businesses that are under "common control," also referred to as businesses that are members of a control group, are treated as a single employer for purposes of ERISA withdrawal liability. *See* 29 U.S.C. § 1301(b)(1). Section 1301(b)(1) defines "common control" by reference to Treasury Regulations prescribed under 26 U.S.C. § 414(c). *See Amalgamated Lithographers of Am. v. Unz & Co. Inc.*, 670 F. Supp. 2d 214, 223 (S.D.N.Y. 2009). "The Internal Revenue regulations set out three ways a group of trades or businesses can be commonly controlled – a parent-subsidiary group, a brother-sister group, or a 'combined' group consisting of both parent-subsidiary and brother-sister relationships." *Cent. States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC*, 668 F.3d 873, 880 (7th Cir. 2011) (citing 26 C.F.R. § 1.414(c)-2(a)).

Plaintiff has not alleged facts to state a plausible claim that any of the relationships that fall within the ambit of § 1301(b) and the Treasury Regulations exist in this case. In fact, rather than relying on the IRS regulations to support its position, Plaintiff relies on a single district court case from Massachusetts. *See* Dkt. No. 42 at 30 (citing *Sun Capital Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*, No. CV 10-10921-DPW, 2016 WL 1239918 (D. Mass. Mar. 28, 2016)). Plaintiff's reliance on this case, however, is misplaced. In *Sun Capital Partners*,

the court merely held that a joint venture, as a group, could hold a controlling interest in a subsidiary when the members of the joint venture individually would not have a sufficient interest. *See Sun Capital Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*, No. 10-10921-DPW, 2016 WL 1239918, *17 (D. Mass. Mar. 28, 2016).[9] *Sun Capital Partners* presents an entirely different factual scenario than this case and is, therefore, inapposite. Accordingly, because Plaintiff has not even remotely alleged facts that would plausibly suggest that Defendant and Penn Traffic constituted a single employer for purposes of ERISA withdrawal liability, the Court grants Defendant's motion to dismiss Plaintiff's third cause of action.

### F.     Fourth cause of action - joint employer liability

Although the MPPAA does not define the term "employer," the Second Circuit has adopted a definition. *See Korea Shipping Corp. v. New York Shipping Ass'n-Int'l Longshoremen's Ass'n Pension Trust Fund*, 880 F.2d 1531, 1537 (2d Cir. 1989) (holding that the term "employer" means "'a person who is *obligated to contribute* to a plan either as a direct employer or in the interest of an employer of the plan's participants'" (quotation and other citations omitted) (emphasis added)). Furthermore, although the Second Circuit has never clarified what "obligation to contribute" means, other circuits have. In this regard, the Sixth Circuit has recognized the connection between the accepted definition of employer having the "obligation to contribute" and the explicit definition of "obligation to contribute" in the MPPAA. *See Cent. States, Se. & Sw. Areas Pension Fund v. Int'l*

---

[9] In other words, if Companies A, B, and C each owned 30% of Company X, alone they would fail to meet the IRS regulations for a parent-subsidiary relationship, which requires 80% ownership. However, if Companies A, B, and C formed a joint venture to control Company X, the court would aggregate their ownership percentages, which equal 90%, and find that their joint venture was a *de facto* parent company in common control with Company X.

*Comfort Prods., LLC*, 585 F.3d 281, 286 (6th Cir. 2009). In *Int'l Comfort Prods.*, the Sixth Circuit

noted that the MPPAA defined "obligation to contribute" as an "'obligation to contribute arising –

(1) under one or more collective bargaining (or related) agreements, or (2) *as a result of a duty*

*under applicable labor-management relations law*.'" *Id.* (quoting 29 U.S.C. § 1392(a) (emphasis

added)). Thus, the Sixth Circuit held that the term "employer" includes a business with a

contractual relationship to contribute as well as a business "that had an obligation to contribute to

the Fund 'under applicable labor-management relations law.'" *Id.* at 287 (quoting 29 U.S.C.

§ 1392(a)(2)).

On the other hand, the Seventh, Eighth, and Ninth Circuits have held that "an entity's

obligation to contribute must be 'created by contract' in order for the entity to be an employer under

the MPPAA." *Int'l Comfort Prods.*, 585 F.3d at 285; *see, e.g., Cent. States, Se. & Sw. Areas*

*Pension Fund v. Cent. Transp., Inc.*, 85 F.3d 1282, 1287 (7th Cir. 1996) (holding that "[t]he

appropriate inquiry is whether the alleged employer had an obligation to contribute [to the pension

fund] as well as the nature of that obligation" and "the nature of the obligation to contribute [is]

contractual, and therefore the party 'who is signatory to a contract creating the obligation to

contribute is the "employer" for purposes of establishing withdrawal liability'" (quoting *Rheem*, 63

F.3d at 707); *Rheem Mfg. Co. v. Cent. States, Se. & Sw. Areas Pension Fund*, 63 F.3d 703, 707 (8th

Cir. 1995) (holding that, for purposes of MPPAA liability, an "employer" is an entity that has

assumed a contractual obligation to make contributions to a pension fund); *H.C. Elliott, Inc. v.*

*Carpenters Pension Trust Fund for N. California*, 859 F.2d 808, 813 (9th Cir. 1988) (holding that

the term "employer" "describes one who was a signatory employer with respect to the plan").

Plaintiff concedes that Defendant did not have a contractual obligation to contribute to the

Pension Fund but argues, nonetheless, that the Court should reject the reasoning of the Seventh, Eighth and Ninth Circuits. *See* Dkt. No. 42 at 31-32. Although the Second Circuit has not yet addressed this issue, district courts in the Second Circuit that have done so have reached different conclusions. *Compare Div. 1181 Amalgamated Transit Union - New York Emps. Pension Fund v. New York City Dep't of Educ.*, No. 13-cv-9112, 2014 WL 4370724, *8 (S.D.N.Y. Aug. 27, 2014) (holding that *Korea Shipping* incorporates statute's definition of obligation to contribute) *with Olivieri v. P.M.B. Constr., Inc.*, 383 F. Supp. 2d 393, 404 (E.D.N.Y. 2005) (relying on *Rheem* to conclude that ERISA does not incorporate the joint-employer doctrine).

Although there are merits to both approaches, the Court finds the reasoning of the Sixth Circuit persuasive because, rather than creating a judicial definition of the term "obligation to contribute," the Sixth Circuit incorporates the words of the statute to give meaning to *Korea Shipping*'s holding.

In any event, even if joint-employer liability did apply to this case, Plaintiff has failed to allege sufficient facts to survive a motion to dismiss. "A joint employer relationship may be found to exist where there is sufficient evidence that the respondent had immediate control over the other company's employees." *NLRB v. Solid Waste Servs., Inc.*, 38 F.3d 93, 94 (2d Cir. 1994) (*per curiam*) (citations omitted). Factors relevant to this determination include "commonality of hiring, firing, discipline, pay, insurance, records, and supervision." *Id.* Importantly, the contracts between Defendant and Penn Traffic specifically foreclosed Defendant's participation in any control over the employees. *See* Dkt. No. 23-4 at § 10. In this regard, the contract provided that "[Defendant] shall not exercise any authority over the Penn Traffic Employees, including, but not limited to, selecting, engaging, fixing the compensation of, discharging, and otherwise managing, supervising, and

controlling the Penn Traffic Employees and no joint employer relationship shall exist."  *See id.*

The existence of this contract creates a strong presumption that Defendant's relationship with the Teamsters Local 317 employees, who are the only employees relevant in the joint-employer context, was not one of "immediate control," and the complaint fails to allege any facts to the contrary.[10]  Although Plaintiff alleges some facts that tend to show that Defendant exercised some supervision over the relevant employees, Plaintiff does not allege any facts regarding the other factors that are relevant to the analysis of this issue.  As to Plaintiff's claim that "[Defendant] directed, controlled, and benefitted from the day-to-day activities of Teamsters Local 317 members," *see* Dkt. No. 28 at ¶ 21, this conclusory statement, while potentially relevant to the factor of "supervision," fails again to state any specifics.  Furthermore, merely instructing the warehouse employees where and how to deliver the inventory is insufficient to show "immediate control."  Accordingly, after considering the contracts together with the scant allegations in the amended complaint, the Court concludes that Plaintiff has not stated a plausible joint-employer claim and, therefore, grants Defendant's motion to dismiss Plaintiff's fourth cause of action.[11]

---

[10] The Court notes that there is an important distinction between "successor liability" and "joint employer liability."  Successor liability looks to the relationship between two companies based on the totality of the circumstances and the federal right that is implicated, whereas joint employer liability looks to the relationship between one company and another company's employees.

[11] In this regard, the Court notes that Plaintiff's reliance on the factors listed in *Zheng v. Liberty Apparel Co., Inc.*, 355 F.3d 61 (2d Cir. 2003), is misplaced.  In *Zheng*, the court addressed the issue of joint employment under the Fair Labor Standards Act of 1938 ("FLSA"), which uses "'"the broadest definition [of 'employ'] that has ever been included in any one act"'" and encompasses "'working relationships, which prior to [the FLSA], were not deemed to fall within an employer-employee category.'"  *Id.* at 69 (quotations and footnote omitted) (recognizing that the FLSA's definition of employer is broader than common law and holding that the four-factor test the district court had used was inappropriately narrow).

## IV. CONCLUSION

Having reviewed the entire file in this matter, the parties' submissions and the applicable law and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion to dismiss Plaintiff's first amended complaint, *see* Dkt. No. 23, is **GRANTED in part** and **DENIED in part**. In this regard, the Court grants the motion with regard to Plaintiff's second, third and fourth causes of action and denies the motion with regard to Plaintiff's first cause of action; and the Court further

**ORDERS** that this matter is referred to Magistrate Judge Baxter for all further pretrial matters.

**IT IS SO ORDERED.**

Dated: May 1, 2017
      Syracuse, New York

                                      Frederick J. Scullin, Jr.
                                      Senior United States District Judge