UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

NEW YORK STATE TEAMSTERS
CONFERENCE PENSION AND
RETIREMENT FUND, by its Trustees,
Michael S. Scalzo, Sr., John Bulgaro, Daniel
W. Schmidt, Tom J. Ventura, Bob Schaeffer,
Brain Hammond, Mark May and Paul
Markwitz,

        Plaintiff,

v.

C&S WHOLESALE GROCERS, INC.

        Defendant.

Case No.: 5:16-cv-084 (FJS/ATB)

## ANSWER OF DEFENDANT C&S WHOLESALE GROCERS, INC. TO FIRST AMENDED COMPLAINT

    Comes now Defendant C&S Wholesale Grocers, Inc. ("Defendant" or "C&S") and

answers Plaintiff's First Amended Complaint ("Amended Complaint") as follows:

    All charging allegations set forth in any headings in the Amended Complaint are denied,

and all allegations not specifically admitted in this Answer are also hereby denied.  Plaintiff's

demand for a jury trial represents a legal conclusion to which no response is required; if a

response is required, Defendant denies that Plaintiff has any right to a jury trial.

## SUMMARY OF ACTION

    This action arises out of C&S's December 2008 takeover of the Penn Traffic Company's
wholesale distribution business.  Following the takeover, the Penn Traffic Company went
bankrupt, hundreds of Teamsters union members once employed by the Penn Traffic Company
lost their jobs, and more than $48 million in withdrawal liability owed to the Pension Fund went
unpaid.  In short, all went according to C&S's plan—and the Pension Fund, its thousands of
participants, and the families of those participants were left to suffer the consequences.

    C&S is liable for the unpaid withdrawal liability for four independent reasons.  First, it
was the successor to the Penn Traffic's Company's wholesale distribution business, and as a
matter of law it assumed the Penn Traffic Company's withdrawal liability.  Second, C&S

purposefully structured its takeover of the Penn Traffic Company's wholesale distribution business to evade or avoid pension and withdrawal liability to the Pension Fund, an act which, in and of itself, is a violation of federal law that subjects C&S to withdrawal liability. Third, notwithstanding the technical separation in ownership between C&S and the Penn Traffic Company under state law, C&S and the Penn Traffic Company operated in sufficient tandem such that they were in "common control" with one another under federal law, rendering C&S jointly and severally liable for the Penn Traffic Company's withdrawal liability. And fourth, following the takeover, C&S was, for all intents and purposes, an employer of the Teamsters union members, and as such it now shares in the withdrawal liability owed to the Pension Fund.

In support of these claims, Plaintiffs make the following more detailed allegations based upon personal knowledge as to their own actions, and upon information and belief as to the actions of others.

**ANSWER**: Defendant states that this "Summary of Action" does not represent factual allegations and therefore no response is required. If a response is required, Defendant denies the allegations in the "Summary of Action."

## JURISDICTION AND VENUE

1) This is an action for monetary and/or equitable relief to recover employer withdrawal liability, interest, costs, attorneys' fees and other penalties as authorized by the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

**ANSWER:** Defendant states that the allegations in Paragraph 1 represent legal conclusions to which no response is required; if a response is required, Defendant denies the allegations in Paragraph 1.

2) Pursuant to ERISA sections 4221(b)(1), 4301(a)(1) and/or 4301(b) the Trustees are authorized to bring a civil action on behalf of the Pension Fund for the purpose of collecting unpaid withdrawal liability, among other things.

**ANSWER:** Defendant states that the allegations in Paragraph 2 represent legal conclusions to which no response is required; if a response is required, Defendant admits that certain sections of ERISA authorize the Trustees to bring a civil action on behalf of the Pension Fund to collect unpaid withdrawal liability, and denies the remaining allegations in Paragraph 2.

3) This Court has subject matter jurisdiction pursuant to ERISA section 4301(c).

**ANSWER:** Defendant states that Paragraph 3 represents a legal conclusion to which

no response is required; if a response is required, Defendant admits the allegation in Paragraph 3.

4)     Venue properly lies in this Court pursuant to ERISA section 4301(d) because the Pension Fund is administered within this district.

**ANSWER:**     Defendant states that Paragraph 4 represents a legal conclusion to which

no response is required; if a response is required, Defendant admits the allegation in Paragraph 4.

5)     Venue also lies in this Court pursuant to the rules and regulations of the Pension Fund, which designate that such actions be brought here.

**ANSWER:**     Defendant states that Paragraph 5 represents a legal conclusion to which

no response is required; if a response is required, Defendant states that it is not bound by the

rules and regulations of the Pension Fund, and denies the allegation in Paragraph 5 on that basis.

6)     Plaintiffs have served a copy of this First Amended Complaint upon the Pension Benefit Guaranty Corporation by certified mail, pursuant to ERISA section 4301(g).

**ANSWER**:     Defendant states that it lacks knowledge or information sufficient to form

a belief as to the truth of the allegation in Paragraph 6, and denies it on that basis.

## PARTIES

7)     The Pension Fund, as an employee benefit fund, was created and exists pursuant to an Agreement and Declaration of Trust entered into between participating employers and union locals affiliated with the International Brotherhood of Teamsters ("Teamsters"). The Pension Fund is a "multiemployer plan" as defined in ERISA section 3(37)(A).

**ANSWER**:     Defendant admits the allegations in the first sentence of Paragraph 7.

Defendant states that the allegation that the Pension Fund is a "multiemployer plan" as defined in

ERISA section 3(37)(A) represents a legal conclusion to which no response is required; if a

response is required, Defendant admits that allegation.

8)     At all times relevant hereto, the Pension Fund has had its offices at, and has been administered from, 151 Northern Concourse, Syracuse, New York 13212.

**ANSWER:**     Defendant admits the allegations in Paragraph 8.

9)     The Pension Fund is managed by its Board of Trustees, which is the "plan sponsor" as defined in ERISA section 3(16)(B)(iii). The Pension Fund, by its Board of Trustees,

as plan sponsor of an employee benefit and multiemployer pension plan ("Plan"), is established and regulated pursuant to ERISA and the Labor Management Relations Act.

**ANSWER:** Defendant admits that the Fund is managed in part by its Board of Trustees. Defendant states that the other allegations in Paragraph 9 represent legal conclusions to which no response is required; if a response is required, Defendant admits those allegations.

10) The Board of Trustees is comprised of an equal number of labor and management representatives. All are "fiduciaries" of the Plan as defined in ERISA section 3(21). Michael S. Scalzo, John Bulgaro, Daniel W. Schmidt, Tom J. Ventura, Bob Schaeffer, Brain Hammond, Mark May and Paul Markwitz are the individual trustees of the Pension Fund.

**ANSWER:** Defendant admits that the Board of Trustees is comprised of an equal number of labor and management representatives. Defendant states that it lacks knowledge or information sufficient to form a belief as to the identities of the current trustees, and denies the allegation concerning their identities on that basis. Defendant states that the remaining allegations in Paragraph 10 represent legal conclusions to which no response is required; if a response is required, Defendant denies the remaining allegations in Paragraph 10.

11) The Pension Fund receives contributions from employers which operate or do business within the jurisdiction of Teamsters locals and which participate in the Plan pursuant to collective bargaining agreements and participation agreements.

**ANSWER:** Defendant admits that the Pension Fund receives contributions from employers which operate or do business within the jurisdiction of Teamsters locals; that certain collective bargaining agreements obligate such contributions; and that certain participation agreements set forth the rates of such contributions. Defendant states that the remaining allegations in Paragraph 11 represent legal conclusions to which no response is required; if a response is required, Defendant denies the remaining allegations in Paragraph 11.

12) The Pension Fund pays pension and retirement benefits to qualified participants in the Plan. The Pension Fund provides pension and retirement benefits to more than 35,000 active and retired Teamsters members and their families throughout New York State.

**ANSWER:** Defendant admits the allegation in the first sentence of Paragraph 12.

Defendant states that it lacks knowledge or information sufficient to form a belief as to truth of

the allegations in the second sentence of Paragraph 12, and denies it on that basis.

13) C&S is one of the largest, privately-held companies in the United States with sales exceeding $25 billion. C&S bills itself as the largest food wholesale supply company in the country.

**ANSWER:** Defendant admits the allegations in the first sentence of Paragraph 13.

Defendant states that it describes itself as "the largest wholesale grocery supply company in the

U.S." and denies the remaining allegations in the second sentence of Paragraph 13.

14) C&S is a Vermont corporation with its principal place of business located at 7 Corporate Dr., Keene, New Hampshire 03431. C&S may not be in good standing under the laws of the State of Vermont for failure to hold regular board of directors meetings or other failures to comply with corporate formalities.

**ANSWER:** Defendant admits the allegations in the first sentence of Paragraph 14.

Defendant denies the allegations in the second sentence of Paragraph 14.

## BACKGROUND

### The Penn Traffic Company and its Syracuse Facilities

15) The Penn Traffic Company ("Penn Traffic") was a well-known, Syracuse-based company. It was founded in 1854. As recently as 2008, it was one of the leading food retailers and wholesalers in the northeastern United States.

**ANSWER:** Defendant admits that Penn Traffic was based in Syracuse and operated as

a food retailer and wholesaler. Defendant states that it lacks knowledge or information sufficient

to form a belief as to truth of the remaining allegations in Paragraph 15, and denies them on that

basis.

16) Through its retail division, Penn Traffic owned and operated approximately 109 supermarkets located in New York, Pennsylvania, Vermont and New Hampshire under the "P&C Foods," "Bi-Lo Foods," and "Quality Markets" trade names, among others. Through its wholesale distribution division, Penn Traffic supplied food and other supermarket products to 121 independently-owned supermarkets.

**ANSWER**:     Defendant admits that at certain times Penn Traffic operated supermarkets in several northeastern states under several trade names, including "P&C Foods" and "Bi-Lo Foods," and that at certain times Penn Traffic also operated a wholesale distribution business that supplied food and other supermarket products to retail supermarkets. Defendant states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 16, and denies them on that basis.

17)     Penn Traffic owned and operated warehouses located in both Syracuse, New York and DuBois, Pennsylvania where product was shipped to stores for both the retail and the wholesale distribution divisions.

**ANSWER:**     Defendant admits that Penn Traffic operated warehouses located in both Syracuse, New York and DuBois, Pennsylvania where product was shipped to stores for both the retail and the wholesale distribution divisions. Defendant states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegation in Paragraph 17, and denies it on that basis.

18)     Penn Traffic's wholesale distribution division utilized, in part, several Syracuse-based warehouse facilities.

**ANSWER:**     Defendant admits the allegations in Paragraph 18, but states that these warehouse facilities were located on a single campus in Syracuse.

19)     Penn Traffic employed approximately 450 members of Teamsters Local 317 who performed bargaining unit work at the Syracuse facilities. That work included, among other jobs, warehouse, maintenance, drivers, and mechanics.

**ANSWER:**     Defendant admits that Penn Traffic employed members of Teamsters Local 317 at its Syracuse facilities, and the work they performed included, among other jobs, warehouse, maintenance, drivers, and mechanics. Defendant states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 19, and denies them on that basis.

20)     Penn Traffic was a party to various collective bargaining agreements with Teamsters Local 317.  Among other things, the collective bargaining agreements required contributions to the Pension Fund on behalf of the employees represented by Teamsters Local 317 who performed  bargaining unit work at the Syracuse facilities.

**ANSWER:**     Defendant admits the allegations in Paragraph 20.

21)     Penn Traffic was also a party to various participation agreements with the Pension Fund that further required contributions to the Pension Fund on behalf of the Penn Traffic employees represent by Teamsters Local 317 who performed bargaining unit work at the Syracuse facilities.

**ANSWER:**     Defendant states that it lacks knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 21, and denies them on that basis.

22)     Penn Traffic was one of the largest contributing employers to the Pension Fund, contributing approximately $1.8 million annually to the Pension Fund for the work performed by the Penn Traffic employees represent by Teamsters Local 317 at the Syracuse facilities.

**ANSWER:**     Defendant states that it lacks knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 22, and denies them on that basis.

23)     In or around May 2003, Penn Traffic filed for Chapter 11 bankruptcy protection. In or around April 2005, Penn Traffic emerged from the Chapter 11 bankruptcy.  At that time, Penn Traffic's then-CEO, Robert Chapman, declared that Penn Traffic would "emerge from Chapter 11 with a solid financial platform, a core of healthy and competitive supermarkets, and strong bakery and wholesale/franchise operations."  He further declared that Penn Traffic was "beginning life as a new company with a solid capital structure, greatly reduced debt, disciplined and improved operations, and a strengthened management team.  Penn Traffic today is a leaner, strong competitor with bright prospects.  We are excited to now redirect our attention from the turnaround toward growth and profitability."

**ANSWER:**     Defendant admits the allegation in the first sentence of Paragraph 23.

Defendant states that it lacks knowledge or information sufficient to form a belief as to the truth

of the remaining allegations in Paragraph 23, and denies them on that basis.

24)     In 2006, Mr. Gregory Young joined Penn Traffic as its Executive Vice President and Chief Operating Officer.  Immediately prior to joining Penn Traffic, Mr. Young was employed by C&S, where he held the title of Vice President/General Manager, Retail and Independent Sales.

**ANSWER:** Defendant states that Mr. Gregory Young was, prior to July 15, 2006, employed at C&S as Vice President & General Manager, Sales and Retail Marketing, and later employed by Penn Traffic, and otherwise denies the allegations in the second sentence of Paragraph 24. Defendant states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 24, and denies them on that basis.

25) Also in 2006, Myles da Cunha joined Penn Traffic as its Vice President of Merchandising. Immediately prior to joining Penn Traffic, Mr. da Cunha was employed by C&S, where he held the title of Senior Director of Merchandising.

**ANSWER:** Defendant admits that Myles da Cunha was, prior to November 18 2006, employed at C&S as Director of Perishable Marketing, and later employed by Penn Traffic, and otherwise denies the allegations in the second sentence of Paragraph 25. Defendant states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 25, and denies them on that basis.

26) Several other executives of C&S joined Penn Traffic at or around the same time as Mr. Young.

**ANSWER:** Defendant states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26, and denies them on that basis.

27) The former Co-President of C&S, Mark Gross, left C&S to form Surry Investment Advisors, LLC ("Surry"), which was retained by Penn Traffic to act as its financial advisor, as set forth below.

**ANSWER:** Defendant admits that Mark Gross was at one time the Co-President of C&S, and that he later formed a company known as Surry Investment Advisors, LLC ("Surry"). Defendant states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 27, and denies them on that basis.

28)    In October 2007, Mr. Young was promoted to President and CEO of Penn Traffic. Also in 2007, despite less than a year of formal employment at Penn Traffic, other former C&S executives received significant promotions at Penn Traffic.

**ANSWER:**    Defendant states that it lacks knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 28, and denies them on that basis.

<u>The 2008 Transaction with C&S</u>

29)    In or around March 2008, C&S began discussing a joint takeover of Penn Traffic with Tops Markets.  It was initially proposed that Tops Markets would take over Penn Traffic's retail stores, and C&S would take over Penn Traffic's wholesale distribution division.

**ANSWER:**    Defendant admits that, in 2008, C&S discussed one or more possible

business transactions, including transactions involving Penn Traffic and/or Tops Markets.

Defendant denies the remaining allegations in Paragraph 29.

30)    Penn Traffic's Syracuse-based Teamsters Local 317 employees participated in the Pension Fund, which was associated with a significant withdrawal liability obligation.

**ANSWER:**    Defendant admits that Penn Traffic's Syracuse-based Teamsters Local 317

employees participated in the Pension Fund, and denies the remaining allegation in Paragraph

30.

31)    In contrast, Penn Traffic's DuBois, Pennsylvania warehouse employees participated in a Penn Traffic single-employer pension plan, which was not subject to any withdrawal liability.

**ANSWER:**    Defendant admits that Penn Traffic's DuBois, Pennsylvania warehouse

employees participated in a single-employer pension plan, and denies the remaining allegations

in Paragraph 31.

32)    During 2008, Penn Traffic requested, and the Pension Fund's external actuary calculated, down to the penny, Penn Traffic's present estimated withdrawal liability obligation to the Pension Fund.  The Pension Fund provided Penn Traffic with both this estimated withdrawal liability and the details underlying the calculation, information which Penn Traffic promptly passed to C&S.

**ANSWER:** Defendant states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32, and denies them on that basis.

33) C&S, which was itself a direct contributing employer to the Pension Fund through warehouses it managed for Tops Markets in Lancaster and Cheektowaga, NY, was already familiar with the Pension Fund's underfunding and actuarial assumptions, and had been continuously monitoring the steady increases in its own potential estimated withdrawal liability to the Pension Fund.

**ANSWER:** Defendant admits it had some familiarity with the Fund's underfunding during 2008, and denies the remaining allegations in Paragraph 33.

34) In addition to relying on the calculations provided by the Pension Fund, C&S commissioned projections on future withdrawal liability increases to the Pension Fund.

**ANSWER:** Defendants denies the allegations in Paragraph 34.

35) During discussions of how to structure a transaction, the most significant concern expressed by both Tops Markets and C&S was Penn Traffic's pension liability exposure.

**ANSWER:** Defendant denies the allegations in Paragraph 35.

36) C&S indicated that it was interested in formally taking over Penn Traffic's entire wholesale distribution division *if* Tops Markets and/or Penn Traffic could provide C&S sufficient protection from withdrawal liability exposure related to the Syracuse warehouses.

**ANSWER:** Defendant admits that protection from possible exposure to withdrawal liability was among the factors discussed and considered as C&S evaluated potential business transactions involving Penn Traffic, and denies the remaining allegations in Paragraph 36.

37) In June 2008, C&S proposed to formally take over Penn Traffic's entire wholesale distribution business.

**ANSWER:** Defendant admits that in 2008 it proposed to Penn Traffic that C&S acquire certain assets relating to Penn Traffic's wholesale distribution business, and denies the remaining allegations in Paragraph 37.

38) At the time, Surry was working with Penn Traffic to divest and/or dissolve its business operations.

**ANSWER:**     Defendant states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38, and denies them on that basis.

39)     Because C&S did not want to comply with ERISA section 4204 (which, under certain circumstances, permits pension liabilities to be transferred between companies without triggering a withdrawal), C&S's proposal would have triggered Penn Traffic's withdrawal liability.  Accordingly, C&S advised that Penn Traffic would need to satisfy the full amount of the withdrawal liability obligation to the Pension Fund.

**ANSWER:**     Defendant states that the allegation about the effect of compliance with ERISA section 4204, and the allegation about the effect of C&S's alleged proposal on Penn Traffic's withdrawal liability, represent legal conclusions to which no response is required. Defendant admits that it did not want to use the safe harbor to withdrawal liability in ERISA section 4204, and denies the remaining allegations in Paragraph 39.

40)     In the event that Penn Traffic was unwilling to trigger and pay its withdrawal liability, C&S proposed an alternative, staged approach that would involve C&S immediately taking over procurement and formally assuming control of the DuBois warehouses, but leave formally assuming control of the Syracuse warehouses until a later date.  In the interim, C&S would work with Penn Traffic to implement C&S's state-of-the-art warehouse operations systems and procedures to improve efficiency at the Syracuse warehouses, even though Penn Traffic would remain the  employer of record for the Teamsters employees.

**ANSWER:**     Defendant admits that, in 2008, it offered to discuss with Penn Traffic, as an alternative to an asset purchase, providing procurement services immediately and deferring for future consideration any purchase of assets relating to the wholesale distribution business. Defendant denies the remaining allegations in Paragraph 40.

41)     The reason C&S did *not* want to immediately proceed with formally taking control of the Syracuse warehouses, but did want to immediately proceed with formally taking control of the DuBois warehouses, was because of the difference in withdrawal liability.

**ANSWER:**     Defendant denies the allegations in Paragraph 41.

42)     C&S was aware that, if it had formally acquired the entirety of Penn Traffic's wholesale distribution division and become the employer of record of all of the Local 317 members, it would be liable to the Pension Fund for withdrawal liability, as the successor to Penn Traffic's warehouse distribution business.

**ANSWER:**   Defendant denies the allegations in Paragraph 42.

43)   But for the withdrawal liability associated with the Local 317 members who worked at Penn Traffic's Syracuse warehouses, in 2008 C&S would have formally acquired the entirety of Penn Traffic's wholesale distribution division and become the employer of record of all of the Local 317 members.

**ANSWER:**   Defendant denies the allegations in Paragraph 43.

44)   Penn Traffic's owners and executives did not want to trigger withdrawal liability at the time of a sale to C&S, and instead preferred to use Penn Traffic's available assets to enrich themselves.

**ANSWER:**   Defendant states that it lacks knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 44, and denies them on that basis.

45)   To lessen the likelihood that C&S would be deemed liable for the withdrawal liability, C&S and Penn Traffic agreed to have C&S succeed to Penn Traffic's wholesale distribution business in two steps.

**ANSWER:**   Defendant denies the allegations in Paragraph 45.

46)   First, C&S would acquire substantially all of the assets (including all of the customers) of Penn Traffic's wholesale distribution business.  But Penn Traffic would continue to nominally hold the withdrawal liability by remaining the employer of record for the Local 317 members at the Syracuse warehouses.

**ANSWER:**   Defendant denies the allegations in Paragraph 46.

47)   Second, Penn Traffic would fire all of the Local 317 members at the Syracuse warehouses, thereby triggering the withdrawal liability.  That withdrawal liability would be discharged in bankruptcy, and C&S would continue to provide identical services and products to a virtually indistinguishable set of stores and customers.

**ANSWER:**   Defendant denies the allegations in Paragraph 47.

48)   In fact, as early as 2006, Penn Traffic executives had considered, in connection with closing a warehouse in Jamestown, NY in favor of using a C&S warehouse, the possibility of nonetheless temporarily retaining the to-be-fired employees in order to support an argument that no withdrawal liability was owned.

**ANSWER**:   Defendant states that it lacks knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 48, and denies them on that basis.

49) C&S was aware that if it had continued to operate out of the Syracuse warehouses it faced a substantial risk of successor liability. In order to lessen that risk, C&S planned to run an otherwise identical business out of a different warehouse.

**ANSWER:** Defendant denies the allegations in Paragraph 49.

50) Prior to acquiring substantially all of the assets of Penn Traffic's wholesale distribution business, C&S began looking for functionally identical locations proximate to the existing Syracuse warehouses from which to operate a substitute warehouse. No business reason existed for such a change.

**ANSWER:** Defendant denies the allegations in Paragraph 50.

The Transaction

51) In December 2008, Penn Traffic and C&S executed an asset purchase agreement and other related agreements that effected C&S's takeover of the wholesale distribution division operated by Penn Traffic (hereinafter referred to as the "Transaction").

**ANSWER**: Defendant admits that, in December 2008, Penn Traffic and C&S executed

an asset purchase agreement and other related agreements, which contracts speak for themselves.

Defendant denies the remaining allegations in Paragraph 51.

52) Through the asset purchase agreement, C&S acquired, *inter alia*, Penn Traffic's wholesale distribution contracts, customers, equipment, files, records, goodwill, intellectual property, accounts receivable, and employees dedicated to Penn Traffic's wholesale distribution division who were not members of Teamsters Local 317.

**ANSWER:** Defendant states that the asset purchase agreement speaks for itself, and

denies the remaining allegations in Paragraph 52.

53) As a condition of the asset purchase agreement, C&S and Penn Traffic then executed a series of additional agreements which, combined with the asset purchase agreement, allowed C&S to continue Penn Traffic's wholesale distribution division without interruption, to the same or substantially the same customers, out of the same warehouse facilities, and using the same infrastructure, procedures, and personnel as Penn Traffic, including all of the warehouse employees who were members of Teamsters Local 317.

**ANSWER:** Defendant admits that in connection with its entering into the asset

purchase agreement, C&S and Penn Traffic entered into several additional agreements, which

speak for themselves. Defendant denies the remaining allegations in Paragraph 53.

54) C&S therefore structured its takeover of Penn Traffic's wholesale distribution division in order to evade or avoid triggering or assuming pension withdrawal liability by, among other things, (i) electing not to comply with ERISA section 4204 (which provides that a sale to a *bona fide* purchaser who undertakes certain pension obligations does not trigger a "withdrawal" under ERISA, (ii) specifying in the asset purchase agreement that, following the takeover, the Teamsters union members would remain employees of Penn Traffic, and (iii) requiring Penn Traffic to indemnify C&S for any pension withdrawal liability incurred as a result of the Transaction.

**ANSWER:** Defendant denies the allegations in Paragraph 54.

55) C&S's negotiations with Penn Traffic were not at arms'-length, due (in whole or in part) to some of Penn Traffic's executives and consultants' personal loyalties and financial ties to C&S.

**ANSWER:** Defendant denies the allegations in Paragraph 55.

56) Additionally, Surry actively advised Penn Traffic as it considered how to divest its business divisions to C&S and Tops. During that time, Surry was still actively advising C&S and has continued to be affiliated with C&S through at least 2015. For its part in the Transaction, Surry received a substantial fee.

**ANSWER:** Defendant states that it lacks knowledge or information sufficient to form a belief as to the truth of the first and third sentences of Paragraph 56, and denies them on that basis. Defendant admits that Surry provided advisory services to C&S at certain times between 2008 and 2015, and denies the remaining allegations in the second sentence of Paragraph 56.

57) Following execution of the asset purchase agreement, the Pension Fund requested that Penn Traffic provide information about the Transaction pursuant to ERISA section 1399(a). The Pension Fund made this request because it was concerned about protecting the pensions of the employees represented by Teamsters Local 317 at the Syracuse facilities.

**ANSWER:** Defendant states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 57, and denies them on that basis.

58) Penn Traffic, however, refused to provide any information about the Transaction to the Pension Fund.

**ANSWER:** Defendant states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 58, and denies them on that basis.

The Aftermath

**The Operations**

59) Following the Transaction, C&S and Penn Traffic began transferring distribution volume from the Syracuse warehouses to the DuBois warehouses.

**ANSWER:** Defendant admits that, at some point following the Transaction, the volume of product shipped to and from the DuBois warehouses increased while the volume of product shipped to and from the Syracuse warehouses declined. Defendant denies the remaining allegations in Paragraph 59.

60) No business reason existed for transferring distribution volume from the Syracuse warehouses to the DuBois warehouses, and numerous owners of the independent stores C&S acquired as customers following its acquisition of Penn Traffic's distribution contracts expressed concern over the transfer.

**ANSWER:** Defendant denies the allegations in Paragraph 60.

61) Following C&S's takeover of Penn Traffic's wholesale distribution division, C&S directed, controlled and benefitted from the day-to-day activities of the Teamsters Local 317 members working at the Syracuse facilities, without whom C&S would have been unable to continue the wholesale distribution operations.

**ANSWER:** Defendant admits that, subsequent to December 2008, C&S contracted with Penn Traffic to provide certain services to C&S; that Penn Traffic provided those services in part through Teamsters Local 317 members whom Penn Traffic employed at its Syracuse facilities; and that C&S paid Penn Traffic to provide those services. Defendant denies the remaining allegations in Paragraph 61.

62) In particular, C&S employees stationed at the Syracuse warehouse directly instructed warehouse personnel (nominally still working for Penn Traffic) regarding the type and quantity of goods the Teamsters Local 317 members needed to select and deliver, to which of C&S's customers they needed to be delivered, and when those goods needed to arrive. Moreover, C&S employees personally met with warehouse personnel regarding changes and corrections that C&S thought should be made to the Teamsters Local 317 members' selection and routing of product.

**ANSWER:**     Defendant admits that C&S employees provided information to Penn Traffic employees regarding the services that Penn Traffic was to perform for C&S, including regarding the goods that Teamsters Local 317 members should select, the customers to whom they should be delivered, and the date of delivery.  Defendant denies the remaining allegations in Paragraph 62.

63)     Following the Transaction, substantially all of the inventory at the Syracuse warehouses was owned by C&S, and all of the distribution employees at the Syracuse warehouses serviced only C&S, which, in turn, paid for their services.

**ANSWER:**     Defendant denies the allegations in Paragraph 63.

64)     With the exception of the siphoning of product from the Syracuse warehouses to the DuBois warehouses, following the Transaction the operations at both warehouses were materially identical to what they would have been had C&S formally acquired the entirety of Penn Traffic's wholesale distribution division and become the employer of record of all of the Local 317 members.

**ANSWER:**     Defendant denies the allegations in Paragraph 64.

65)     Following the Transaction, Mr. Young informed the public that C&S's takeover of Penn Traffic's wholesale distribution division would allow Penn Traffic to focus on its retail division, restore Penn Traffic's profitability, and position Penn Traffic for long-term success.

**ANSWER:**     Defendant states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 65, and denies them on that basis.

66)     In May 2009, Mr. Young received a $400,000 bonus for his part in Penn Traffic's sale of its warehouse distribution division to C&S.  Five other Penn Traffic executives, some of whom were also formerly with C&S split an additional $600,000 in bonuses between them.

**ANSWER:**     Defendant states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 66, and denies them on that basis.

67)     These bonuses were not made in the normal course of business, and along with the non-arm's-length nature of the Transaction, drained resources from Penn Traffic.

**ANSWER:**     Defendant states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 67, and denies them on that basis.

68)     In November 2009, only months after Penn Traffic's executives split at least $1,000,000 in bonuses and less than a year after C&S took over Penn Traffic's wholesale distribution division, Mr. Young pronouncements proved false. Penn Traffic filed for Chapter 11 bankruptcy, leading ultimately to a liquidation of all of Penn Traffic's remaining assets, including Penn Traffic's retail division.

**ANSWER:**     Defendant admits that Penn Traffic filed for Chapter 11 bankruptcy in November 2009, and that Penn Traffic eventually liquidated its remaining assets. Defendant states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegation regarding bonuses to Penn Traffic's executives, and denies them on that basis. Defendant denies the remaining allegations in Paragraph 68.

69)     In the bankruptcy proceedings, C&S then aided Tops Markets to ensure that Tops markets would be the successful bidder for Penn Traffic's retail division, *i.e.*, the same retail division that was the object of the C&S and Tops Markets' joint takeover discussions in early 2008.

**ANSWER:**     Defendant admits that Tops Markets acquired certain of Penn Traffic's retail grocery stores in connection with the Penn Traffic bankruptcy, and denies the remaining allegations in Paragraph 69.

70)     On January 25, 2010, the bankruptcy court approved the sale of 79 Penn Traffic stores to Tops Markets. Thereafter, Tops Markets divested 3 of its newly acquired stores to Mr. Young and Mr. da Cunha, with the aid of a favorable supply contract with C&S, allowing Mr. Young and Mr. da Cunha to run their grocery-chain—where they remain today.

**ANSWER:**     Defendant admits that a bankruptcy court approved the sale of 79 Penn Traffic retail stores to Tops Markets, and that Tops Markets divested certain stores in order to avoid potential antitrust obstacles to such sale. Defendant states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 70, and denies them on that basis.

71)     Tops Markets also acquired the right to formally control the DuBois warehouses, which it promptly transferred to C&S. The DuBois warehouses remain open and the employees there continued to be employed by C&S and/or C&S's wholly-owned subsidiary DuBois Logistics LLC.

**ANSWER:** Defendant admits that in connection with the Penn Traffic bankruptcy,

Tops Markets acquired certain rights relating to the DuBois warehouses; that Tops Markets

assigned certain of those rights to C&S; that the DuBois warehouses continue to operate; and

that certain of the employees at such warehouses are employed by DuBois Logistics LLC, a

wholly-owned subsidiary of C&S. C&S denies the remaining allegations in Paragraph 71.

72) After redirecting the supply of the stores formerly serviced from the Syracuse facilities, the operations at those facilities were wound down, and they ultimately closed on or about May 14, 2010.

**ANSWER:** Defendant admits that the operations at the Syracuse warehouses wound

down; that the warehouses were closed on or about May 2010; and that stores formerly serviced

from the Syracuse warehouses were later serviced from other facilities. Defendant denies the

remaining allegations in Paragraph 72.

73) When C&S caused the Syracuse facilities to cease operations, approximately 450 employees represented by Teamster Local 317 at those facilities lost their jobs. Because those Teamsters Local 317 members were no longer employed and contributions to the Pension Fund ceased, the Pension Fund determine that a "complete withdrawal" from the Pension Fund had occurred, as defined in ERISA section 4203.

**ANSWER:** Defendant denies that it caused the Syracuse facilities to cease operations,

but admits that when the Syracuse warehouses ceased operations, the Penn Traffic employees at

the warehouses who were members of Teamsters Local 317 lost their jobs, and that the Pension

Fund determined that Penn Traffic had completely withdrawn from the Pension Fund.

74) Following the withdrawal from the Pension Fund, the Pension Fund calculated the amount of withdrawal liability owing pursuant to ERISA 4201.

**ANSWER:** Defendant states that it lacks knowledge or information sufficient to form

a belief as to the truth of the allegation in Paragraph 74, and denies it on that basis. Defendant

further denies that the Pension Fund correctly calculated the amount of withdrawal liability.

75) In April 2010, though a proof of claim filed in the Penn Traffic Bankruptcy proceedings, the Pension Fund delivered to Penn Traffic a notice and demand for payment of

withdrawal liability, within the meaning of ERISA section 4219, in the amount of $63,592,689.25. C&S was on notice of the withdrawal liability claim filed by the Pension Fund.

**ANSWER:** Defendant admits that the Pension Fund filed a proof of claim in the Penn Traffic bankruptcy proceedings in April 2010, but denies that such proof of claim was in the amount of $63,592,689.25, and denies the allegations in the second sentence of Paragraph 75. Defendant states that the allegation that the Pension Fund complied with ERISA section 4219 represents a legal conclusion to which no response is required.

76) In the bankruptcy proceedings, Penn Traffic disputed certain aspects of the Pension Fund's withdrawal liability claim, but Penn Traffic never contested the Pension Fund's assessment or determination of the amount of withdrawal liability. C&S also never contested the Pension Fund's assessment or determination of the amount of withdrawal liability, despite having actual knowledge of the withdrawal liability.

**ANSWER:** Defendant states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 76, and denies them on that basis. Defendant denies the allegations in the second sentence of Paragraph 76.

77) Penn Traffic did not initiate arbitration to dispute the Pension Fund's withdrawal liability determination pursuant to ERISA section 4221(a)(1). C&S also never initiated arbitration to dispute the withdrawal liability assessed by the Pension Fund.

**ANSWER:** Defendant states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegation in the first sentence of Paragraph 77, and denies it on that basis. Defendant denies the allegation in the second sentence of Paragraph 77.

78) Consequently, the amounts demanded by the Pension Fund became due and owing, pursuant to ERISA section 4221(b)(1).

**ANSWER:** Defendant states that the allegations in Paragraph 78 represent legal conclusions to which no response is required; if a response is required, Defendant denies the allegations in Paragraph 78.

79) At the time, the amount of withdrawal liability assessed by the Pension Fund was the single largest liability ever owed by an employer to the Pension Fund. This threatened the financial stability of the Plan and the benefits promised to the participants and beneficiaries.

**ANSWER:** Defendant states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 79, and denies them on that basis.

80)     As a result of Penn Traffic's bankruptcy proceedings, the Pension Fund received only $5,206,088.34 of the withdrawal liability, leaving a balance of $58,386,600.91 in unpaid withdrawal liability that is due and owing to the Pension Fund.

**ANSWER:** Defendant states that it lacks knowledge or information sufficient to form a belief as to the amount of money that the Pension Fund has received in connection with its claim against Penn Traffic, and denies the allegations in Paragraph 80 on that basis. Defendant denies that $58,386,600.91 is due and owing to the Pension Fund.

81)     In sum, as contemplated from the start of the C&S, Tops Markets and Penn Traffic discussions in early 2008: (i) Penn Traffic ceased to exist; (ii) Top Markets took over most of Penn Traffic's retail stores; and (iii) C&S fully took over Penn Traffic's wholesale distribution division, including the DuBois warehouses, and continued to supply the independently-owned stores as well as the former Penn Traffic retail stores Tops Markets acquired. Additionally, the product at the Syracuse warehouses (which C&S had planned to close if Penn Traffic was unwilling or unable to pay its withdrawal liability) was shifted to other C&S warehouses.

**ANSWER:** Defendant admits that (i) Penn Traffic has ceased to exist; (ii) Tops Markets acquired many of Penn Traffic's retail grocery stores; and (iii) C&S acquired certain assets relating to Penn Traffic's wholesale distribution business. Defendant further admits that it provides services to Tops Markets in connection with retail stores that Tops Markets owns and which were previously owned by Penn Traffic, and to other retail stores previously supplied by Penn Traffic. Defendant denies the remaining allegations in Paragraph 80.

82)     C&S has not paid a penny in withdrawal liability to the Pension Fund.

**ANSWER:** Defendant states that it does not owe any withdrawal liability to the Pension Fund, and therefore admits that it has not paid any such liability.

83)     Penn Traffic paid less than 10% of the withdrawal liability.

**ANSWER:**    Defendant states that it lacks knowledge or information sufficient to form

a belief as to the truth of the allegation in Paragraph 83, and denies it on that basis.

## COUNT I
## Withdrawal Liability as Successor to Penn Traffic

84)    Plaintiffs re-allege and incorporate by reference the allegations set forth in
paragraphs 1 through 83 above, as if fully rewritten herein.

**ANSWER:**    Defendant repeats and incorporates by reference its responses to

Paragraphs 1 through 83, as set forth above.

85)    At the time of the Transaction, and at all relevant times, C&S was aware that
Penn Traffic was a contributing employer to the Pension Fund, that the Pension Fund was
underfunded, and that, if Penn Traffic's contributions ceased, a withdrawal would occur and
withdrawal liability would become due.

**ANSWER:**    Defendant admits that at the time of the Transaction C&S was aware that

Penn Traffic was a contributing employer to the Fund, that the Fund was underfunded, and that if

Penn Traffic's contributions were to permanently cease, a withdrawal would occur.  Defendant

denies the remaining allegations in Paragraph 85.

86)    C&S was aware of the approximate amount of withdrawal liability that would be
triggered by Penn Traffic's withdrawal from the Pension Fund.

**ANSWER:**    Defendant denies the allegation in Paragraph 86.

87)    Following the Transaction, C&S continued Penn Traffic's wholesale distribution
division in a continuous and uninterrupted fashion.  Examples include, but are not limited to, the
following:

a)    C&S maintained the same address and telephone number(s) and conducted
business from the same facilities as Penn Traffic.

b)    C&S serviced the same customers that Penn Traffic once serviced.

c)    C&S  conducted business using the same personnel as Penn Traffic.  C&S
became the direct employer of Penn Traffic employees once dedicated to Penn Traffic's
wholesale distribution business, all of whom were non-union.  C&S directed, controlled,
and benefited from the Teamsters Local 317 members working at the Syracuse facilities.

**ANSWER:** Defendant admits that, following the Transaction, it provided services to certain of Penn Traffic's former wholesale distribution customers, and that it hired certain non-union employees who previously had been employed by Penn Traffic. Defendant further admits that, following the Transaction, C&S contracted with Penn Traffic to provide certain services to C&S; that Penn Traffic provided those services in part through Teamsters Local 317 members whom Penn Traffic employed at its Syracuse facilities; and that C&S paid Penn Traffic to provide those services. Defendant denies the remaining allegations in Paragraph 87.

88) As a matter of law, including federal common law as developed under ERISA, C&S is the successor to Penn Traffic, and it is jointly and severally liable for the outstanding withdrawal liability amounts due and owing to the Pension Fund following Penn Traffic's complete withdrawal from same, together with interest, costs, attorneys' fees, and any penalties related thereto.

**ANSWER:** Defendant states that the allegations in Paragraph 88 represent legal conclusions to which no response is required; if a response is required, Defendant denies the allegations in Paragraph 88.

## COUNT II
## Transaction to Evade or Avoid Withdrawal Liability

89) Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 88 above, as if fully rewritten therein.

**ANSWER:** Defendant repeats and incorporates by reference its responses to Paragraphs 1 through 89, as set forth above.

90) The Transaction between C&S and Penn Traffic allowed C&S to continue Penn Traffic's wholesale distribution division in a continuous and uninterrupted fashion.

**ANSWER:** Defendant states that by Memorandum Decision & Order dated May 1, 2017, the Court dismissed Count II of the First Amended Complaint, and therefore no response to the allegations in Paragraph 90 is required. If a response is required, Defendant denies the allegations in Paragraph 90.

91) A principal purpose of the Transaction undertaken by C&S and Penn Traffic was to evade or avoid withdrawal liability, in violation of ERISA.

**ANSWER:** Defendant states that by Memorandum Decision & Order dated May 1, 2017, the Court dismissed Count II of the First Amended Complaint, and therefore no response to the allegations in Paragraph 91 is required. Defendant further states that the allegations in Paragraph 91 represent legal conclusions and for that independent reason no response is required. If a response is required, Defendant denies the allegations in Paragraph 91.

92) Accordingly, under ERISA section 4069(a) and/or ERISA section 4212(c), the withdrawal liability is to be determined and collected against C&S, which is liable for the unpaid balance of the withdrawal liability together with interest, costs, attorneys' fee and any penalties related thereto.

**ANSWER:** Defendant states that by Memorandum Decision & Order dated May 1, 2017, the Court dismissed Count II of the First Amended Complaint, and therefore no response to the allegations in Paragraph 92 is required. Defendant further states that the allegations in Paragraph 92 represent legal conclusions and for that independent reason no response is required. If a response is required, Defendant denies the allegations in Paragraph 92.

## COUNT III
## Entities Under Common Control

93) Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 and 92 above, as if fully rewritten herein.

**ANSWER:** Defendant repeats and incorporates by reference its responses to Paragraphs 1 through 92, as set forth above.

94) Over more than a two-year period, C&S and Penn Traffic agreed to and jointly executed a plan to split up and temporarily run Penn Traffic's wholesale distribution business in order to avoid paying withdrawal liability.

**ANSWER:** Defendant states that by Memorandum Decision & Order dated May 1, 2017, the Court dismissed Count III of the First Amended Complaint, and therefore no response

to the allegations in Paragraph 94 is required. If a response is required, Defendant denies the

allegations in Paragraph 94.

95)    Financial information regarding the performance of the nominally separate
wholesale distribution business was kept (and existed separate and apart from either C&S or
Penn Traffic's remaining lines of business). C&S and Penn Traffic each stood to realize a profit
or loss based on the financial success of their wholesale distribution business.

**ANSWER:**    Defendant states that by Memorandum Decision & Order dated May 1,

2017, the Court dismissed Count III of the First Amended Complaint, and therefore no response

to the allegations in Paragraph 95 is required. If a response is required, Defendant denies the

allegations in Paragraph 95.

96)    Accordingly, under ERISA section 4001(b) C&S was in common control with
Penn Traffic with respect to the Syracuse warehouse operations, which employed the employees,
and it is jointly and severally liable for the outstanding withdrawal liability amounts due and
owing to the Pension Fund following Penn Traffic's complete withdrawal from same, together
with interest, costs, attorneys' fees, and any penalties related thereto.

**ANSWER:**    Defendant states that by Memorandum Decision & Order dated May 1,

2017, the Court dismissed Count III of the First Amended Complaint, and therefore no response

to the allegations in Paragraph 96 is required. Defendant further states that the allegations in

Paragraph 96 represent legal conclusions and for that independent reason no response is required.

If a response is required, Defendant denies the allegations in Paragraph 96.

## COUNT IV
## Withdrawal Liability as a Joint Employer

97)    Plaintiffs re-allege and incorporate by reference the allegations set forth in
paragraphs 1 and 96 above, as if fully rewritten herein.

**ANSWER:**    Defendant repeats and incorporates by reference its responses to

Paragraphs 1 through 96, as set forth above.

98)    In the contracts entered into in the Transaction, C&S purported to disclaim all
obligations to the Pension Fund, including pension and withdrawal liability associated with the
Teamsters Local 317 members working at the Syracuse facilities.

**ANSWER:**     Defendant states that by Memorandum Decision & Order dated May 1,

2017, the Court dismissed Count IV of the First Amended Complaint, and therefore no response

to the allegations in Paragraph 98 is required.  If a response is required, Defendant states that the

contracts speak for themselves; admits that C&S assumed no obligations or liabilities to the

Pension Fund under those contracts; and denies all remaining allegations in Paragraph 98.

99)     However, in those contracts C&S assumed the obligation to make payments to
Penn Traffic, and those payments related to obligations that arose under the collective bargaining
agreements or related agreements with the Pension Fund and/or the Teamsters Local 317.

**ANSWER:**     Defendant states that by Memorandum Decision & Order dated May 1,

2017, the Court dismissed Count IV of the First Amended Complaint, and therefore no response

to the allegations in Paragraph 99 is required.  If a response is required, Defendant admits that

certain contracts it entered into in the Transaction required it to make payments for services that

Penn Traffic provided to C&S, and denies all remaining allegations in Paragraph 99.

100)     Additionally, or in the alternative, through its course of conduct during and
following the Transaction (including its relationship to and control over the Teamsters Local 317
members), C&S had a duty to the Pension Fund and the Teamsters Local 317 under applicable
labor-management relations law.

**ANSWER:**     Defendant states that by Memorandum Decision & Order dated May 1,

2017, the Court dismissed Count IV of the First Amended Complaint, and therefore no response

to the allegations in Paragraph 100 is required.  Defendant further states that the allegations in

Paragraph 100 represent legal conclusions and for that independent reason no response is

required.  If a response is required, Defendant denies the allegations in Paragraph 100.

101)     Accordingly, under ERISA section 3(5) and/or ERISA section 4312(a), C&S had
an obligation to contribute to the Pension Fund, and it is jointly and severally liable for the
outstanding withdrawal liability amounts dues and owing to the Pension Fund following Penn
Traffic's complete withdrawal from same, together with interest, costs, attorneys' fees, and any
penalties related thereto.

**ANSWER:** Defendant states that by Memorandum Decision & Order dated May 1, 2017, the Court dismissed Count IV of the First Amended Complaint, and therefore no response to the allegations in Paragraph 101 is required. Defendant further states that the allegations in Paragraph 101 represent legal conclusions and for that independent reason no response is required. If a response is required, Defendant denies the allegations in Paragraph 101.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Court award judgment in favor of Plaintiffs with respect to Counts I, II, III and/or IV and order the following relief:

a.      That C&S be ordered to pay the Pension Fund the withdrawal liability owed to the Pension Fund in the amount of $58,386,600.91.

b.      That C&S be ordered to pay to the Pension Fund, in addition to the withdrawal liability owed:

(1)      Interest on the unpaid withdrawal liability from the date of first delinquency until payment at the annual rate of 11%;

(2)      An award of double interest at the rate of 11%;

(3)      Attorneys' fees and court costs; and

c.      Such other legal and equitable relief against C&S as this Court deems just and appropriate.

**ANSWER:** Defendant denies that Plaintiff has a right to any relief.

## FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the applicable statute of limitations set forth at ERISA § 413, 29 U.S.C. § 1113.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by laches.

## THIRD AFFIRMATIVE DEFENSE

The Amended Complaint fails to state a claim upon which relief can be granted.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff seeks relief that is not available under ERISA.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by action of the Bankruptcy Court in the Penn Traffic bankruptcy.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff is not entitled to relief under any equitable common law doctrines.

## SEVENTH AFFIRMATIVE DEFENSE

Certain actuarial assumptions used to calculate the amount of withdrawal liability owed by Penn Traffic were legally flawed, and result in a withdrawal liability amount that is excessive and illegal under ERISA. Imposition of this liability on Defendant would violate ERISA and the Due Process Clause of the Fifth Amendment to the United States Constitution.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff failed to mitigate the damages for any withdrawal liability owed by Penn Traffic, including but not limited to claims against third parties and failure to take action in the Penn Traffic bankruptcy to increase the value of the Penn Traffic estate.

**WHEREFORE,** the Defendant, C&S Wholesale Grocers, Inc., requests judgment as follows:

1. Dismiss the First Amended Complaint in its entirety;

2. Award attorney's fees, costs and disbursements to Defendant;

3. If a judgment is awarded against Defendant, order that the Fund recalculate the withdrawal liability using reasonable actuarial assumptions that are lawful under ERISA;

4. If a judgment is awarded against Defendant, order that such judgment be further reduced by (i) the recovery that the Fund obtained from Penn Traffic, plus interest thereon, and (ii) any lost recovery from other third parties or from the Penn Traffic estate as a result of Plaintiff's failure to mitigate damages; and

5. Order such other legal and equitable relief against C&S as this Court deems just and appropriate.

**RESPECTFULLY SUBMITTED** this 26th day of May, 2017,

By: /s/ Evan Miller

Evan Miller (*pro hac vice*)
Sara Pikofsky (*pro hac vice*)
Yaakov Roth (*pro hac vice*)
JONES DAY
51 Louisiana Avenue N.W.
Washington, DC 20001
Phone: (202) 879-3939
Email: *emiller@jonesday.com*

John G. Powers (Bar Roll No. 508934)
HANCOCK ESTABROOK, LLP
1500 AXA Tower I
100 Madison Street
Syracuse, NY 13202
Telephone: (315) 565-4500
Email: *jpowers@hancocklaw.com*

Alan Kintisch (*pro hac vice*)
C&S WHOLESALE GROCERS, INC.
7 Corporate Drive
Keene, NH 03431
Telephone: (603) 354-7340
Email: *akintisc@cswg.com*

*Attorneys for Defendant C&S Wholesale Grocers, Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 26th day of May 2017, the foregoing Answer of Defendant C&S Wholesale Grocers, Inc. to First Amended Complaint was filed with the Clerk of Court via CM/ECF and served electronically upon all counsel of record.

/s/ John G. Powers
John G. Powers

*Counsel for Defendant*