UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

NEW YORK STATE TEAMSTERS
CONFERENCE PENSION AND
RETIREMENT FUND, *by its Trustees,
Michael S. Scalzo, Sr., John Bulgaro,
Daniel W. Schmidt, Tom J. Ventura, Bob
Schaeffer, Brian Hammond, Mark May and
Paul Markwitz,*

          Plaintiff,

   v.             5:16-CV-84
                     (FJS/ATB)
C&S WHOLESALE GROCERS, INC.,

         Defendant.
_____

| APPEARANCES | OF COUNSEL |
|---|---|
| **GROOM LAW GROUP**<br>1701 Pennsylvania Avenue, N.W.<br>Suite 1200<br>Washington, D.C. 20006<br>Attorneys for Plaintiff | EDWARD J. MEEHAN, ESQ.<br>MARK C. NIELSEN, ESQ.<br>STEPHEN M. SAXON, ESQ.<br>LEVINE THOMAS, ESQ.<br>SAMUEL LEVIN, ESQ. |
| **PARAVATI, KARL, GREEN &<br>DEBELLA, LLP**<br>520 Seneca Street<br>Suite 105<br>Utica, New York 13502<br>Attorneys for Plaintiff | VINCENT M. DEBELLA, ESQ. |
| **C&S WHOLESALE GROCERS, INC.**<br>7 Corporate Drive<br>Keene, New Hampshire 03431<br>Attorneys for Defendant | ALAN KINTISCH, ESQ. |
| **HANCOCK ESTABROOK, LLP**<br>100 Madison Street<br>Suite 1500<br>Syracuse, New York 13202<br>Attorneys for Defendant | JOHN G. POWERS, ESQ.<br>RYAN M. POPLAWSKI, ESQ. |

JONES DAY  EVAN MILLER, ESQ.
51 Louisiana Avenue, N.W.  JACOB M. ROTH, ESQ.
Washington, D.C. 20001
Attorneys for Defendant

**SCULLIN, Senior Judge**

# MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Pending before the Court are (1) Defendant's motion for partial judgment on the pleadings pursuant to Rule 12(c), *see* Dkt. No. 131; (2) Defendant's motion for summary judgment pursuant to Rule 56, *see* Dkt. No. 136; and (3) Plaintiff's cross-motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, *see* Dkt. No. 139.

## II. BACKGROUND

**A. Undisputed facts**

The Penn Traffic Company ("Penn Traffic") was a publicly traded regional grocery business located in the Northeastern United States. *See* Dkt. No. 136-1, Def.'s Stmt. of Undisputed Material Facts ("DSUMF"), at ¶ 2.[1] Before filing for bankruptcy in November 2009, Penn Traffic owned and operated approximately 80 retail grocery stores ("the corporate stores") and a wholesale business that procured, warehoused, and distributed groceries for more than 100 independent retail grocery stores. *See id.* at ¶¶ 3-4. Penn Traffic operated two warehouse facilities, one of which was in Syracuse, New York. *See id.* at ¶ 6. Penn Traffic was obligated under three collective bargaining agreements ("CBAs") with Teamsters Local 317 to

---

[1] The Court references Plaintiff's Response to Def.'s Stmt of Undisputed Material Facts ("PSUMF") when there are minor discrepancies, such as word-choice or conclusions of law; but the Court emphasizes that all of the facts in this section are undisputed.

contribute to the New York State Teamsters Conference Pension and Retirement Fund ("Plaintiff" or "the pension fund") for work members of Teamsters Local 317 performed at the Syracuse warehouse. *See id.* at ¶ 9.

C&S Wholesale Grocers, Inc. ("Defendant") is a privately-owned company that provides procurement, warehousing, and distribution services for grocery businesses across the United States. *See id.* at ¶ 1. In December 2008, Defendant entered into an agreement with Penn Traffic, whereby Penn Traffic agreed to sell Defendant its relationships and contracts with its wholesale customers in exchange for a cash payment. *See id.* at ¶¶ 12-13. Defendant did not acquire Penn Traffic's retail stores, the Syracuse warehouse lease, or the trailers, trucks, or forklifts used at the warehouse. *See id.* at ¶¶ 14-16; PSUMF at ¶¶ 15(a)-16(a).

Pursuant to the 2008 transaction, Defendant agreed to hire 30 Penn Traffic employees who had supported Penn Traffic's wholesale business, none of whom worked in the Syracuse warehouse unloading trucks or storing, selecting, packing, or shipping products. *See* DSUMF at ¶¶ 19, 22; PSUMF at ¶ 22(a). Defendant did not hire any members of Teamsters Local 317, nor did it expressly enter into a CBA with Teamsters Local 317. *See* DSUMF at ¶¶ 17-18; PSUMF at ¶ 18(a). The 2008 transaction did not alter Penn Traffic's CBA with Teamsters Local 317, and its obligation to contribute to the pension fund continued. *See* DSUMF at ¶ 23.

Following the 2008 transaction, Penn Traffic and Defendant entered into a separate agreement, in which Defendant paid Penn Traffic as a subcontractor for services provided at the Syracuse warehouse. *See generally id.* at ¶ 34. These services included warehousing and distributing products out of the Syracuse warehouse for Defendant's wholesale customers. *See id.* at ¶ 31.

After Penn Traffic's bankruptcy in November 2009, Defendant did not purchase Penn Traffic's interest in the Syracuse warehouse or any of the equipment used at the Syracuse warehouse from Penn Traffic's bankruptcy estate. *See id.* at ¶ 47. In May 2010, as part of its liquidation, Penn Traffic closed the Syracuse warehouse; and, at that time, it withdrew from the pension fund and incurred withdrawal liability. *See id.* at ¶¶ 48, 49. The exact amount of withdrawal liability is disputed, but Plaintiff alleged that Penn Traffic owed nearly $60 million. *See* Dkt. No. 28, First. Amend. Compl. at ¶ 80. When Plaintiff filed its complaint in 2016, Penn Traffic had only paid Plaintiff $5,206,088.34 of that liability. *See id.*

### B. Procedural history

As a result of Penn Traffic's unpaid withdrawal liability, Plaintiff filed its complaint in the instant action on January 22, 2016. *See generally* Dkt. No. 1, Compl. In its complaint, Plaintiff alleged the following three counts against Defendant: (1) withdrawal liability as a successor to Penn Traffic, (2) liability for transacting to evade or avoid withdrawal liability, and (3) withdrawal liability as an employer and/or joint employer. *See id.* at ¶¶ 48-61. Plaintiff amended its complaint on April 8, 2016, to allege another cause of action for liability as an entity under common control with Penn Traffic. *See* Dkt. No. 28 at ¶¶ 98-96. Defendant then moved to dismiss Plaintiff's amended complaint. *See* Dkt. No. 23.

On May 1, 2017, the Court granted Defendant's motion in part and denied it in part. *See* Dkt. No. 75, Memorandum-Decision and Order, at 27 ("the 2017 Order"). The Court ultimately dismissed Plaintiff's claims based on the theories of evade or avoid liability, common control liability, and joint employer liability. *See generally id.* The Court found that Plaintiff pled a plausible cause of action against Defendant based on a theory of successor liability. *See id.* at 17. In so finding, the Court held—for the first time in this Circuit—that the theory of successor

liability is applicable to withdrawal liability under the Employee Retirement Income Security Act of 1974 ("ERISA"). *See id.* at 10. Following that decision, Defendant moved for a certificate of appealability on this issue. *See* Dkt. No. 79. The Court denied that motion. *See* Dkt. No. 97.

In addition to defending this case in federal court, Defendant initiated a related arbitration proceeding challenging Plaintiff's calculation of withdrawal liability. *See* Text Minute Entry, Feb. 28, 2018, re Dkt. No. 99, Status Report; *see also* Dkt. No. 116, Text Order. The arbitrator has yet to reach a decision on the amount of withdrawal liability Defendant would have to pay if found responsible. *See* Dkt. No. 182, Status Report. This ongoing arbitration does not affect the parties' agreement that the Court address *liability* issues and not damages in the pending round of dispositive motions. *See* Dkt. No. 116.

### III. DISCUSSION

**A. Parties' cross-motions for summary judgment**

After the Court's 2017 Order, the only remaining cause of action is based on Plaintiff's argument that Defendant is responsible for Penn Traffic's withdrawal liability under the doctrine of successor liability. The parties address this issue in their cross-motions for summary judgment, which the Court discusses below. *See generally* Dkt. Nos. 136, 139.

*1. Legal standard governing motions for summary judgment*

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. Under this Rule, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When deciding a summary judgment motion, a court must resolve

any ambiguities and draw all reasonable inferences in a light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

### 2. *Defendant's responsibility for Penn Traffic's withdrawal liability as a "successor"*

#### a. Introduction

In its 2017 Order, the Court determined that the theory of successor liability could apply to withdrawal liability under ERISA and the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"). *See* Dkt. No. 75 at 10. "[T]he primary reason for making a successor responsible for resulting withdrawal liability is that, '"[a]bsent the imposition of successor liability, present and future employer participants in the union pension plan will bear the burden of [the predecessor's] failure to pay its share," which will threaten the health of the plan while the successor reaps a windfall.'" *See id.* at 13-14 (quoting *Resilient Floor Covering [Pension Trust Fund Bd. of Trs. v. Michael's Floor Covering, Inc.]*, 801 F.3d [1079,] 1093 [(9th Cir. 2015)] (quoting *Artistic Furniture*, 902 F.2d at 1328)).

"An entity has successor liability where '(1) it "had notice of its predecessor's obligations" and (2) '"a sufficient continuity of identity exists between the two businesses."'" *See id.* at 15 (quoting *Romita v. Anchor Tank Lines, LLC*, No. 11 Civ. 9641, 2014 WL 1092867, *4 (S.D.N.Y. Mar. 17, 2014) (quoting *Bd. of Trs. of the Sheet Metal Workers Local Union No. 137*, 1995 U.S. Dist. LEXIS 9330, at *3, 1995 WL 404873 (quoting *Stotter Div. of Graduate Plastics*, 991 F.2d at 1002-03)) (other citation omitted). Thus, the Court must determine whether Defendant had notice of Penn Traffic's obligations and whether Defendant "substantially continued" Penn Traffic's business. "Finally, for successor liability to apply in this factual context, the Court must give special consideration to Defendant's relationship with

the work that the union employees completed." *See id.* at 16 (citing *Howard Johnson [Co., Inc. v. Detroit Local Joint Exec. Bd., Hotel & Rest. Emps. & Bartenders Int'l Union, ALF-CIO]*, 417 U.S. [249,] 262 n.9 [(1974)]).

### b. *Substantial continuity factors[2]*

"'[S]ubstantial continuity in the operation of the business before and after the sale' of its assets is a requirement for successor liability. For had the business not changed there would be no reason for its financial structure to change—no reason therefore to allow the successor company to obtain a windfall by acquiring assets free of liabilities, leaving its predecessor with liabilities but no assets." *Bd. of Trs. of Auto. Mechanics' Local No. 701 Union & Indus. Pension Fund v. Full Circle Grp., Inc.*, 826 F.3d 994, 998 (7th Cir. 2016) (quoting *Tsareff v. ManWeb Services, Inc.*, 794 F.3d [841,] 845 [(7th Cir. 2015)]). In its 2017 Order, the Court cited to the various factors that courts analyze to determine whether there is substantial continuity between businesses, including "continuity of the workforce, management, equipment and location" and "constancy of customers." *See* Dkt. No. 75 at 12 (quoting [*Einhorn v. M.L. Ruberton Constr. Co.*, 632 F.3d 89,] 99 [(3d Cir. 2011)] (citing *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 43, 107 S. Ct. 2225, 96 L. Ed. 2d 22 (1987))) (other citation omitted).

---

[2] In this section, the Court addresses the parties' arguments regarding whether Defendant substantially continued Penn Traffic's business immediately after the 2008 transaction but *before* Penn Traffic went bankrupt. Defendant additionally argues that it did not "substantially continue" the Syracuse warehouse operations following Penn Traffic's bankruptcy. *See* Dkt. No. 136-2, Def's Memorandum of Law, at 37-44. Because the Court ultimately concludes that Defendant did not substantially continue Penn Traffic's business following the 2008 transaction, the Court does not reach the merits of Defendant's post-bankruptcy argument.

### *i. Continuity of the workforce and management*

The most important continuity factor that the Court must consider is whether there was continuity of the workforce and management. *See Members of Bd. of Admin. of Toledo Area Indus. UAW Ret. Income Plan v. OBZ, Inc.*, 348 F. Supp. 3d 635, 648 (N.D. Ohio 2018). The facts of this case present a novel scenario in which a buyer of a business's assets—but not its employees—hires the business as a subcontractor so that the business could continue to do the same work it did before the sale of its assets. In cases where a buyer acquires the seller's assets, including its employees, other courts have found substantial continuity of the workforce unless other questions of fact were present. *See, e.g.*, *OBZ, Inc.*, 348 F. Supp. at 639; *Einhorn v. M.L. Ruberton Constr. Co.*, 632 F.3d 89, 91-92 (3d Cir. 2011).

For example, in *Einhorn v. M.L. Ruberton Constr. Co.*, Statewide, a highway construction company, faced a series of financial hardships; and it was delinquent on its contributions to Teamsters Local 676's and other CBAs' pension funds. *See Einhorn,* 632 F.3d at 91-92. To resolve some of these issues, Local 676 and Ruberton, a general construction company, entered into an agreement whereby Ruberton would hire Statewide's existing workforce covered by the current CBA, and that the CBA would govern such employment until a new CBA was negotiated. *See id.* at 92. In a second agreement, Statewide sold its assets to Ruberton for $1.6 million in cash. *See id.* In addition to the existing employees, Ruberton hired more than half of Statewide's former employees in the months following the sale, including its Vice President and 33% shareholder. *See id.* Statewide remained in business for some time after the asset sale using subcontractors, and it hired Ruberton as one such subcontractor, billing Statewide more than $400,000 for rented employees and equipment. *See id.*

The *Einhorn* court noted that the parties disputed whether Ruberton continued Statewide's business; and, if so, to what extent. *See id.* at 100. For example, the court noted, "Ruberton argues that 'even if Ruberton were deemed to have continued Statewide's business, that continuation would be limited to the … business' covered by the Local 676 CBA and it could not be liable for contributions owed in connection with Statewide's other CBAs." *Id.* (citation omitted). The court held that the presence of factual disputes rendered summary judgment inappropriate. *See id.*

Additionally, in *OBZ, Inc.*, Lockrey, a machining and fabricating company, executed an asset purchase agreement with Toledo Wire, in which Lockrey would pay Toledo Wire $250,000 for its machinery, customer list, and its goodwill. *See OBZ, Inc.*, 348 F. Supp. 3d at 639. After the sale, Lockrey offered jobs to all of Toledo Wire's employees and hired former Toledo Wire manager Eric Fodor. *See id.* at 640. The court noted that continuity of the workforce was the "most important[ ]" factor that weighed in favor of finding that Lockrey substantially continued Toledo Wire's business. *See id.* at 648. However, because a reasonable person could draw conflicting inferences from Lockrey's use of Toledo Wire's intangible assets, the court found that neither side was entitled to summary judgment. *See id.* at 648-49.

The Court finds that the inverse of these courts' rulings is true; if a buyer does not acquire a seller's employees, this weighs against substantial continuity. There is no dispute that Defendant did not actually employ the workers in the Syracuse warehouse; Penn Traffic did. *See* DSUMF at ¶¶ 20-22; PSUMF at ¶¶ 20(a)-22(a).[3] This weighs in favor of Defendant. It is

---

[3] Plaintiff denies this fact only insofar as Defendant claims that its employees were physically located outside of the Syracuse warehouse facility and that David Adamsen, the person in charge of the entire wholesale business, was not present and in day-to-day contact with Penn Traffic's Vice President of Distribution, Tim Cipiti. These are not genuine issues of material fact. Simply being in the same building, by itself, does not show that Defendant substantially

further undisputed that, from December 2008 until the closure of the warehouse, Penn Traffic retained authority to hire, terminate, and discipline employees who worked at the Syracuse warehouse. *See* DSUMF at ¶¶ 37, 39. After the 2008 transaction, Penn Traffic continued to handle benefits and payroll for the members of the Teamsters Local 317 who worked at the Syracuse warehouse. *See* DSUMF at ¶ 38. The 2008 agreement did not alter Penn Traffic's CBA with Teamsters Local 317 or its obligation to contribute to the pension fund at all. *See* DSUMF at ¶ 23. Additionally, from December 2008 until the closure of the warehouse, Penn Traffic continued to employ the managers who oversaw the Syracuse warehouse workers, and those workers reported to supervisors at Penn Traffic. *See* DSUMF at ¶¶ 40-41.

The Court finds that the above-stated facts, taken together with the caselaw, show that Defendant's failure to acquire the warehouse workers as its own employees ultimately means that it did not substantially continue Penn Traffic's workforce and management after the 2008 transaction. Thus, this factor weighs in Defendant's favor.

### *ii. Constancy of customers*

To determine the second factor, courts look at whether the successor took over the predecessor's customers. *See generally Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 57-58 (1987). Before the 2008 transaction, the Syracuse warehouse served two sets of customers: (1) independent stores that contracted with Penn Traffic to obtain their products and receive other services, and (2) the corporate stores owned and operated by Penn Traffic itself. The corporate stores were the dominant customers, responsible for greater than 70% of the

---

continued Penn Traffic's Syracuse warehouse. Additionally, Plaintiff does not assert that Mr. Adamsen had authority over Mr. Cipiti, even if they had day-to-day contact.

volume of product that was shipped through the warehouse, whereas the independent stores accounted for only 30% of the warehouse traffic. *See* DSUMF at ¶¶ 6-7, 32.

Defendant argues that these percentages did not change after it acquired Penn Traffic's customer relationships for the independent stores in the 2008 transaction. *See* Dkt. No. 136-2 at 28. According to Plaintiff, however, Defendant made a "conscious decision" to take over Penn Traffic's relationships with its independent wholesale customers; and, further, taking over 30% of the warehouse inventory intended for Defendant's wholesale customers "is at least some evidence of substantial continuity." *See* Dkt. No. 139-2 at 44-45. To the contrary, Defendant responds that taking over 30% of the operations should not justify imposing on it 100% of Penn Traffic's withdrawal liability. *See* Dkt. No. 154, Def's Reply, at 14. "That is why the successorship doctrine requires '*substantial*' continuity," Defendant asserts, and 30% is *not* substantial. *See id.*

The Court finds that this case is analogous to a case the Second Circuit recently decided, in which the Department of Education ("DOE") and the Union negotiated a written agreement whereby the DOE agreed to insert Employee Protection Provisions into all of its transportation contracts, including those with its Contractors who employed drivers and escorts responsible for driving buses and supervising and aiding students on their trips to and from school. *See Div. 1181 A.T.U. – N.Y. Emps. Pension Fund v. City of New York Dep't of Educ.*, 910 F.3d 608, 612-13 (2d Cir. 2018). The Employee Protection Provisions required each Contractor to contribute to the Union's pension fund on behalf of the participating employees in amounts determined by its DOE contract or with its CBA with the union. *See id.* at 613.

Ultimately, the pension fund's trustees determined that the Contractors effected a "complete withdrawal" from the fund, triggering "withdrawal liability" under the MPPAA. *See*

*id.* (citing 29 U.S.C. § 1381(a)).  After discovery, which was limited to the pension fund's alter ego claim, the DOE moved for summary judgment.  *See id.*  The district court granted Defendant's motion, reasoning that no reasonable jury could conclude, based on the evidence proffered by the pension fund, that the Contractors were the corporate alter egos of the DOE. *See id.* at 614.  The Second Circuit affirmed, thus holding that the DOE was not responsible for the Contractors' withdrawal liability.  *See generally id.* at 619.

The undisputed facts in this case show that Defendant subcontracted Penn Traffic to handle distribution and warehousing for its independent wholesale clients (whom Defendant purchased from Penn Traffic).  *See* DSUMF at ¶ 31; PSUMF at ¶ 31(a).  Based on this agreement, Defendant paid Penn Traffic for the warehouse work it did for Defendant's customers, and Penn Traffic contributed to the pension fund for that work.  *See* Dkt. No. 154 at 14.  Defendant argues that this situation is essentially the same as the DOE hiring Contractors to transport the school district's children to school and contribute to the bus driver's and escort's pension fund for that work, which did *not* result in liability for the DOE.  *See* Dkt. No. 154 at 14 (citing *Div. 1181 A.T.U.*, 910 F.3d at 618).  The Court finds this rationale persuasive; and, thus, the "constancy of customers" factor weighs in Defendant's favor.

### *iii. Continuity of facilities and equipment*

This factor asks whether the successor acquired the predecessor's facilities and equipment.  *See generally Fall River Dyeing*, 482 U.S. at 44.  Defendant notes that, although it purchased assets from Penn Traffic in 2008, those assets were associated with the wholesale business, not the Syracuse warehouse's operations.  *See id.*  In fact, Defendant asserts, the 2008 Asset Purchase Agreement specifically excluded all tangible and intangible assets relating to the warehouse facilities.  *See id.* at 30.  Plaintiff argues that it is most important that Defendant

owned all the inventory inside of the warehouse; and, thus, it owned the most valuable assets associated with the warehouse. *See* Dkt. No. 139-2 at 49. Plaintiff asserts that, by virtue of the fact that Defendant had "full and complete ownership of any inventory" in the warehouse, it was *de facto* Defendant's warehouse. *See id.*

Defendant responds that it is "wrong … to characterize inventory as an 'asset' of the warehouse. The role of the warehouse was to store and distribute inventory—not to buy, sell, or own it. Thus, the relevant assets are those used for warehousing work (e.g., forklifts, racking, and trucks), not cases of groceries. [Defendant] was no more the '*de facto*' owner of Penn Traffic's warehouse … than Amazon is the '*de facto*' owner of the U.S. Postal Service's warehouse." *See* Dkt. No. 154 at 17.

Looking at the undisputed facts, Penn Traffic continued to lease the warehouse from a third party after the 2008 transaction, meaning that neither Penn Traffic nor Defendant owned the building. *See* DSUMF at ¶ 15; PSUMF at ¶ 15(a). Penn Traffic also continued to own the forklifts, trucks, trailers, and other equipment used at the Syracuse warehouse up until it closed in May 2010. *See* DSUMF at ¶ 28; PSUMF at ¶ 28(a). Additionally, following the 2008 transaction, Penn Traffic provided "warehousing and distribution services" for Defendant's customers out of the Syracuse warehouse – not procurement or other inventory-based services. *See* DSUMF at ¶ 31; PSUMF at ¶ 31(a). Based on these facts, the Court finds that Defendant did not substantially continue Penn Traffic's facilities or equipment; and, thus, this factor weighs in Defendant's favor.

### *iv. Conclusion*

For the above-stated reasons, the Court finds that Defendant did *not* substantially continue Penn Traffic's business after the 2008 transaction. Therefore the Court need not

determine whether Defendant was on notice of Penn Traffic's pension obligations, nor must it analyze Defendant's relationship with the work that the union employees completed.[4] Based on the Court's finding, Defendant cannot be held responsible for Penn Traffic's withdrawal liability under the doctrine of successor liability. As such, the Court finds Plaintiff's remaining arguments are without merit.

### B. Defendant's motion for partial judgment on the pleadings

Also pending before the Court is Defendant's motion for partial judgment on the pleadings. *See* Dkt. No. 131. This motion asks the court to "cap[ ] any liability at the unpaid balance of the sum set forth in a settlement agreement between Plaintiff and the Penn Traffic Company." *See id.* Notably, Plaintiff and Penn Traffic reached a settlement during Penn Traffic's bankruptcy proceedings whereby the parties agreed that Plaintiff was entitled to (1) a single general unsecured claim against Penn Traffic in the amount of $32,096,880.00, (2) a single administrative claim against Penn Traffic in the amount of $991,768.00, and (3) priority claims against Penn Traffic in the amount of $371,597.00. *See* Dkt. No. 131-3, Ex. 1.

The Court construes this motion as asking the Court to cap damages. *See* Dkt. No. 131-1, Def.'s Memorandum in Support of Mot. on Pleadings, at 6 (arguing "[Plaintiff]'s recovery is capped at approximately $28 million, as a matter of law. [Defendant] is thus entitled to judgment on the pleadings respecting [Plaintiff]'s demands in excess of that figure." (citation

---

[4] However, if the Court were to decide the issue of notice, it would find that Defendant was on notice of Penn Traffic's withdrawal liability. This is because "an asset buyer is on notice of, and therefore subject to, successor liability if he has 'notice that the seller may be contingently liable for withdrawal liability'" under the MPPAA. *Full Circle Grp., Inc.*, 826 F.3d at 997 (quoting *Tsareff v. ManWeb Services, Inc.*, 794 F.3d at 844-47). Defendant admitted that "[o]f course, [it] knew that the Fund was underfunded, and that if Penn Traffic closed the warehouse, Penn Traffic would incur withdrawal liability." *See* Dkt. No. 136-2 at 34. Therefore, the notice element for successor liability is satisfied.

omitted)). The Court does not reach the merits of this motion, however, because it finds that Defendant is not responsible for Penn Traffic's withdrawal liability. Thus, the Court denies Defendant's motion for partial judgment on the pleadings as moot.

### IV. CONCLUSION

After carefully considering the entire file in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion for summary judgment, *see* Dkt. No. 136, is **GRANTED**; and the Court further

**ORDERS** that Plaintiff's cross-motion for summary judgment, *see* Dkt. No. 139, is **DENIED**; and the Court further

**ORDERS** that Defendant's motion for partial judgment on the pleadings, *see* Dkt. No. 131, is **DENIED** as moot; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendant and close the case.

**IT IS SO ORDERED.**

Dated: March 18, 2020
Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Judge